**UNITED STATES of America,
Plaintiff,**

v.

**FIRST NATIONAL BANK OF FORT SMITH, ARKANSAS, a corporation, and Neil Sims, Defendants.**

**Civ. A. No. 1483.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

June 2, 1959.

Charles W. Atkinson, U. S. Atty., Ft. Smith, Ark., for plaintiff.

Daily & Woods, Ft. Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

This is an action by the Government to require compliance with an "administrative summons" directed to the defendants pursuant to 26 U.S.C.A. § 7602. The summons in question was duly issued and served on April 21, 1959, and commanded the appearance of the defendant Neil Sims as Vice President of the defendant bank, and the production of certain specified bank records. On the day commanded, Mr. Sims presented himself to testify, but did not produce the records required by the summons. Instead, he delivered a letter to Special Agent Merle Little, who issued the summons, in which he and the bank refused to produce the records call-ed for on the ground that the summons was too indefinite to permit literal compliance, and on the further ground that compliance would constitute an unlawful and extremely onerous burden on the bank.

Thereafter the Government filed the complaint herein, in which it alleged the above facts and that the Internal Revenue Service was and had been in the process of investigating income tax returns of Harry N. Pollock; Helen U. Pollock; Pollock Stores Company, Inc.; Pollock Stores Company of Tulsa; H. Newton Pollock and Arlene Pollock; Arcade's Men's Store; and Harry Newton Company, Inc.; that the investigation had uncovered large amounts of unreported income which fact caused the agents to believe that the income tax returns of the above named persons may be fraudulent. The complaint then alleged the issuance of the summons, a copy of which was attached, and the refusal of the bank to comply with the same. A copy of the defendant's letter of refusal in which its reasons therefor were set out was attached to the complaint as Exhibit B.

The complaint prayed an order directing defendants to appear and show cause why they should not be adjudged in contempt. Such an order was issued on May 8, 1959, and pursuant thereto a hearing was held on May 14, 1959. No formal response was filed by the defendants, but they requested at the hearing that their letter of refusal, Exhibit B to the complaint, be treated as their response. This request was granted.

There is little dispute about the facts. For several months revenue agents have been investigating possible tax liability and possible tax fraud on the part of the persons above named. In the course of that investigation they found it necessary or desirable to inspect many bank records including a great number belonging to the defendant bank. For some time Agents Merle Little and A. L. Mc-New inspected records at the defendant bank without incident. Eventually, however, a bank officer requested the agents to serve the bank with a "courtesy sum-

mons" as a protection to the bank, since it did not wish to voluntarily relinquish records on its depositors. Such a summons was issued and the work continued until the bank, after further conversations with Mr. Harry N. Pollock, concluded that cooperation even under the courtesy summons should end. Thereafter the present summons, dated April 21, 1959, was issued and served. It commanded the testimony of the defendant Sims and the production at the same time of the following bank records for the years 1955, 1956, and 1957:

> "Signature cards, ledger sheets, deposit tickets, microfilm records of checks, on all individual and corporate accounts, including checking, savings, special, trust or otherwise, in the names of H. N. or Harry N. Pollock, Helen Pollock, H. Newton Pollock, Arlene Pollock, or in which each or either has an interest or controls, under whatsoever designation entered, excepting records previously furnished."

The summons called for Mr. Sims' presence and production at a room in the Post Office Building in Fort Smith, Arkansas. Mr. Sims duly appeared and refused to furnish the records as above stated.

The defendants' proof was primarily directed to the contention that the summons would impose an unconscionable burden on the bank, even if the records were produced and examined in the bank itself. The primary difficulty in this regard is that the bank has no way of knowing in what accounts any of the named persons under investigation "has an interest or controls." The bank may be able to ascertain this fact, but to do so would require a search of each bank document for the years in question. It would, for example, have to search 17,000 active and 50,000 inactive signature cards, 147,000 ledger sheets, and thousands of microfilm records. Tests were conducted by the bank to determine at what rate employees could make the necessary examination. It was concluded that an impressive total of man-hours

would be required, and the bank president estimated that the cost to the bank would exceed $30,000.00.

Much, if not all, of this expense could be eliminated if the agents were allowed to inspect the records themselves, which they are willing to do, without supervision by bank employees. When they first began their work at the bank, the agents proceeded in this manner. However, the bank's attorney concluded that for protection of the integrity of the file system and in order to fulfill its duty to its other depositors, the bank should have an employee present at all times when revenue agents were inspecting records. Thereafter an employee was usually present while agents inspected bank records.

While a considerable amount of time would be required of the bank to comply with the summons, no officer testified that additional employees would have to be hired. Mr. McCloud Sicard, President of the bank, did testify, however, that overtime had been necessary for some employees while the bank was cooperating with the revenue agents. Thus, while the precise cost to the bank of complying with the summons here cannot be estimated, it is patently substantial.

The summons here was issued under the authority of 26 U.S.C.A. § 7602, which provides:

> "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

> "(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

> "(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having

possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

Section 7604 provides for enforcement of such summons in the District Court where the person summoned resides. The defendants reside in the City of Fort Smith, Arkansas, within the Fort Smith Division of the Western District of Arkansas, and there is no dispute concerning the court's jurisdiction. Neither is there any argument that the statute is inapplicable.

The defendants make three contentions: (1) that the Government must show ground for suspicion of fraud and further must show "a reasonable likelihood that the documents sought would have a bearing on the tax liability" of the persons being investigated; (2) that the summons was so indefinite as to be void; and (3) that the requirements of the summons are so burdensome that to order compliance therewith would be a deprivation of property without due process of law.

The first point above was not raised in the defendants' letter of refusal to comply, which letter was treated as their response, but is raised only in the brief. In any event, the cases cited by defendants do not support their first contention.

■ Of course, the relevancy of any inquiry, and particularly a substantial and costly one, cannot be taken for granted. But once the executive or administrative decision has been made to investi-

gate any taxpayer's accounts, the question is not whether that decision to investigate was sound but only whether the documents sought are reasonably likely to relate to such investigation. In United States ex rel. Sathre v. Third Northwestern National Bank, D.C.Minn.1952, 102 F.Supp. 879, Judge Nordbye, in one of the most thorough opinions on this point, said at page 881:

"And the Government need not establish that the taxpayer was guilty of fraud in his tax return in order to establish its right to inspect records of the kind sought here under the statute. Zimmermann v. Wilson, 3 Cir., 105 F.2d 583; Miles v. United Founders Corp., D.C., 5 F.Supp. 413; In re Andrews' Tax Liability, D.C., 18 F.Supp. 804. The purpose of seeking the information is to determine if fraud does exist, not to obtain records for what the Government already knows. The bank's objection that the Government is 'fishing' is not completely sound. The very purpose of the investigation and that statute suggests and requires that the Government be permitted to indulge in some 'fishing.' In re Keegan, D.C., 18 F.Supp. 746."

In that case, the Government sought records of the defendant bank relating to depositors not under investigation upon the theory that those depositors may have been agents or nominees of those under investigation. The court held that the Government had the burden of making a showing that reasonable ground existed for such a suspicion before records of persons not otherwise involved could be obtained. In other words, the bank "cannot be required to produce B's accounts in an investigation of A's tax returns unless it be alleged that B's account, checks, etc., bear upon the correctness of A's return * * *." First National Bank of Mobile v. United States, 5 Cir., 1947, 160 F.2d 532, 535.

■■ The Government need not show that its investigation is well founded. What it is required to show is that the records it seeks are relevant to that in-

vestigation, whether the investigation itself proves to be well founded or not. Where the records sought on their face relate to financial transactions of taxpayers whose affairs are under inquiry, as here, the court believes that the Government has presented a prima facie case of relevancy. If the records sought are not on their face records of finances of the taxpayers under inquiry, then additional proof should be required. Likewise, if the Government were "investigating" one taxpayer solely for the purpose of thereby obtaining information about another taxpayer, that is, if the investigation were not bona fide, and this fact were shown, the burden of showing relevancy would remain upon the Government. But here there is neither a denial pleaded nor any proof attacking the relevance of the information the Government seeks. Since on its face it purports to be financial records of taxpayers under investigation, it is presumably relevant.

■ The defendants also argue that the summons was not sufficiently particular. The summons need only be sufficiently definite to afford the officers of the bank an opportunity to reasonably identify the material sought. First National Bank of Mobile v. United States, 5 Cir., 1947, 160 F.2d 532. The real difficulty here stems, not from the bank's inability to identify the records sought, but from its inability to do so with a reasonable degree of labor and expense. In other words, the defendants' second contention really goes to the issue of whether the burden cast upon the bank by the summons is unreasonable. The bank argues that it cannot say with certainty, even after examination of the records, in what accounts the persons under inquiry might have some hidden interest. But the bank is required by the summons only to give what it knows, either actually, or what it may "know" from its records. Thus it is not required to conduct any investigation of its depositors' financial affairs outside its own records or actual knowledge, and the question is only

whether the investigation of its records is unreasonably burdensome.

■ With respect to the bank's burden, it may be noted that the decisions require a liberal construction of the statute here involved and permit substantial and effective investigation. See United States ex rel. Sathre v. Third Northwestern National Bank, supra, 102 F. Supp. at page 881 and cases cited. In this circuit it has been held that the powers granted by the statute are analogous to those afforded federal grand juries to perform similar investigations. Brownson v. United States, 8 Cir., 1929, 32 F.2d 844, 845.

At the same time several rules prevent harassment of an innocent third party by such official inquiries. The statute's scope is construed to prevent an undue burden on such parties. See United States ex rel. Sathre v. Third Northwestern National Bank, supra, 102 F.Supp. at page 883. An abuse of the statutory process will not be allowed to cause an unreasonable and onerous burden. See In re Keegan, D.C.S.D.N.Y. 1937, 18 F.Supp. 746; Stone v. Frandle, D.C.Minn.1950, 89 F.Supp. 222; United States ex rel. Sathre v. Third Northwestern National Bank, supra. If the production demands contained in the summons are too unreasonable, the constitutional protection against unreasonable search and seizure may also intervene to afford relief. See Hubner v. Tucker, 9 Cir., 1957, 245 F.2d 35; United States ex rel. Sathre v. Third Northwestern National Bank, supra. Here, the contention is that the burden which the revenue agents attempt to cast upon the bank is so unreasonable as to constitute a deprivation of property without due process of law.

■ It is plain that, at least if any other procedure is available to minimize the bank's costs, the demands of the summons are unreasonable here. Perhaps the demands would be unreasonable even if no alternative procedure were available. The bank, if it complies literally with the command of the summons, will

be required to spend perhaps as much as $30,000 and to transport the records away from its own premises, which is clearly unnecessary. The duties of citizenship do not fall, even upon corporations, with such a heavy hand, at least short of national emergency.

The testimony revealed that procedures short of that followed here may be wholly adequate to the investigation. Special Agent Merle Little testified in answer to a question by the United States Attorney that a preliminary inspection by him of all the signature cards might make it possible for him to specify particularly which ledger sheets and microfilms he will need to complete his investigation. It is not clear whether the bank was willing to make the signature cards available for inspection. At any rate they were not furnished, but an examination of those cards may possibly reduce the extent of the investigation at the bank, and will probably obviate the necessity for the expensive procedures which would be necessary to comply with the summons. It may be true that the bank owes a duty of privacy to its depositors. But that duty is qualified, and to whatever extent it may go, that duty is superseded by the present statute. If it is necessary that investigating agents casually see signature cards of persons not under investigation, they are permitted to do so under the statutes in question, and the bank has fulfilled its duty to its depositors by resisting the investigation in this court. The bank is not required to expend unreasonable sums to furnish the information sought here, as by examining the signature cards itself, unless it prefers such a procedure to inspection by revenue agents. Since an inspection of all the signature cards by the revenue agents may make their demands in the summons unnecessary, this simpler and more economical procedure should be followed.

The court does not wish to be cast in the role of supervising this investigation. In spite of that fact, the court recognizes that inspection of the signature cards by the agents may not solve all the problems of this investigation. Yet, a final answer with the case in its posture, purporting here to give a definitive basis of the rights of the parties probably would not do substantial justice. This action represents a clear clash of legitimate public interest with legitimate private right. Insofar as circumstances may permit, both must be served if justice is to prevail. Unwilling witnesses are daily compelled to testify at some loss to themselves to do justice between private citizens and between the public interest and private right. The bank's position is no different except insofar as it would sustain a greater loss if the summons were complied with. But the duty of a citizen to furnish evidence, while it may cause inconvenience and even some expense to him, does not require the citizen—even a corporate one—to remain supine while his own private rights are trampled rough-shod. Justice must be sustained at the "retail" as well as at the "wholesale" level.

The present summons, at least in the light of procedures which may render such expense unnecessary, is unreasonable and void. The Government may summons the bank or its officials for testimony. It may also summons the bank to produce all of its signature cards, either at the bank or at some other reasonable place, in the option of the bank, or may summons the production of particular signature cards, if identified in such a manner that such cards may be readily identified and located by the bank. If, after following this procedure, the revenue agents need further information, they may specify the records desired with sufficient certainty that the bank may locate them without unreasonable expense to the bank. This procedure may necessitate further hearings, but the court is convinced that it may also avoid the sacrifice of public interests to private rights. The dictates of common sense should resolve most of the problems in this investigation. If they do not, the bank may apply for appropriate relief if necessary, or the Government

may raise the issue further by such additional summonses as it may deem appropriate, and, of course, may issue a new summons in accordance herewith.

The complaint of the plaintiff, United States, therefore, should be dismissed without prejudice to either party to apply by appropriate procedures for further relief as might be necessary.

An order in accordance herewith is being entered today.