SECURITIES AND EXCHANGE
COMMISSION

v.

ARTHUR YOUNG & COMPANY,
Appellant.

No. 76–1716.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 16, 1977.

Decided July 24, 1978.

As Amended Sept. 14, 1978.

Stephen M. Sacks, Washington, D. C., with whom Milton V. Freeman, Washington, D. C., was on the brief, for appellant.

Glynn L. Mays, Atty., SEC, Washington, D. C., with whom David Ferber, Sol., and David J. Romanski, Asst. Gen. Counsel, SEC, Washington, D. C., were on the brief, for appellee. Peter M. Sullivan, Atty., SEC, Washington, D. C., also entered an appearance for appellee.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Arthur Young & Company, a partnership of certified public accountants, appeals from an order of the District Court directing it to comply with a subpoena duces tecum issued by the Securities and Exchange Commission. Review is sought in this court on grounds that the investigative order of the Commission authorizing the subpoena is legally deficient,[1] that relevance of the subpoenaed documents to the

---

1. Discussed in Part II *infra*.

investigation does not sufficiently appear,[2] and that obedience to the subpoena will be unduly burdensome.[3] We find that these arguments do not withstand scrutiny as justification for denying enforcement of the subpoena. We conclude, however, that enforcement should be conditioned upon reimbursement of appellant's costs of compliance to the extent that otherwise the expenses would become unreasonable.[4] We modify the District Court's enforcement order accordingly, and affirm it as so modified.

## I

The pertinent facts are undisputed. The challenged subpoena emanates from a Commission investigation of SCA Services, Inc. (SCA), a publicly-held corporation engaged primarily in waste disposal services[5] and registering securities with the Commission.[6] Appellant has been SCA's principal independent auditor since 1973. On September 25, 1975, the Commission's staff requested, and at its own cost appellant supplied, five groups of materials[7] bearing on transactions between SCA and Christopher Recklitis, its then president and chief operating officer.[8] On October 21, 1975, on the basis of information presented by the staff, the

Commission ordered a private investigation[9] into possible violations by SCA and others of the antifraud provisions of the federal securities laws.[10] The order instructed the staff to ascertain whether there were material factual untruths or omissions in statements filed by SCA with the Commission and disseminated by it to the public;[11] more specifically, whether

[t]he aforementioned registration statements [of SCA] . . . include untrue statements of material facts or omit to state material facts . . . concerning among other things:

1. Interest of management and others in certain transactions.

2. Financial statements.

3. Description of business and property.

4. Acquisition or disposition of assets.[12]

To carry out its investigative responsibilities, the staff was empowered to subpoena "any books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry. . . ."[13]

From its beginning as an inquiry into suspected self-dealing and looting by SCA's management, the investigation blossomed

---

2. Discussed in Part III *infra.*

3. Discussed in Part IV *infra.*

4. Discussed in Part IV *infra.*

5. Appellant provided these services at 94 different locations in 28 states and the District of Columbia, deriving revenues of approximately $149 million during the fiscal year ending March 31, 1975. Joint Appendix (J. App.) 26.

6. Pursuant to Securities Exchange Act of 1934, § 12(b), 15 U.S.C. § 78*l*(b) (1976).

7. This response involved review of approximately 300 to 400 work binders and files, and copying of some of the material extracted, at a cost of more than $15,000. J. App. 29–30.

8. As SCA's independent auditor, appellant renders opinions on the company's financial statements. J. App. 26. Preparation therefor includes periodic review of SCA's financial records, copying of relevant SCA documents, and preparation of workpapers and other materials reflecting the review and audit work performed. J. App. 26–27. SCA maintains the

financial records in fifteen offices. J. App. 27. Appellant's records on SCA audits are located primarily in its offices in ten different cities. J. App. 27–28.

9. Pursuant to Securities Act of 1933, § 19(b), 15 U.S.C. § 77s(b) (1976), and Securities Exchange Act of 1934, § 21(b), 15 U.S.C. § 78u(b) (1976).

10. J. App. 3–4. In normal functioning, the staff conducts a preliminary inquiry prior to issuance of a formal order of investigation. See 17 C.F.R. § 202.5(a) (1977). Since the staff lacks power to employ compulsory process without specific authorization from the Commission, preliminary inquiries are necessarily limited.

11. See Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a) (1976), Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) (1976); 17 C.F.R. § 240.10(b)–5 (1977).

12. J. App. 3–4.

13. J. App. 4.

into one encompassing the full range of SCA's financial affairs, including the caliber of audits conducted by appellant. So it was that on April 23, 1976, the Commission's staff, purportedly pursuant to the investigative order, issued the undeniably broad subpoena that precipitated this litigation.[14] The subpoena demands 14 different categories of documents relating to SCA over a six-year period;[15] and within these 14 categories it calls for documents pertaining to 29 individuals and entities,[16] to "[a]ll officers, directors and employees (present and past)" of SCA,[17] and to "any special engagements, projects or management consulting services" performed by appellant for SCA.[18]

Appellant refused to honor the subpoena.[19] The Commission then sought enforcement in the District Court and appellant promptly moved to quash. The court, concluding that the investigation pursued a lawfully authorized purpose and that the

subpoenaed materials were relevant thereto, ordered enforcement,[20] but subject to two conditions designed to ameliorate the burden of compliance. One was that the documents be examined at the offices of appellant wherein they were ordinarily kept;[21] the other was that the Commission absorb the expense of copying all documents that appellant might agree to release temporarily for that purpose.[22] The court made plain, however, that "[f]or those documents that [appellant] determines it cannot allow to leave its possession, [appellant] shall provide copies to the Commission."[23] Dissatisfied with this disposition, appellant brought the controversy here.[24]

## II

The Securities and Exchange Commission is statutorily authorized to "make such investigations as it deems necessary to determine whether any person has

---

**14.** As Commission counsel informed the District Court "[w]hat we are basically looking for are their audit and tax work papers and every document relied upon in preparing the audit and tax reports." J. App. 56–57.

**15.** Item 1 of the listing annexed to the subpoena in relevant part reads:

> All documents including but not limited to (1) audit programs; (2) internal control evaluation; (3) schedules prepared by personnel of Arthur Young & Company and/or SCA Services, Inc., subsidiaries or affiliates; (4) documents received by Arthur Young & Company in the course of the audit; (5) memoranda relative to the audit, audit conclusions, technical matters, policy, accounting theory, or auditing problems; (6) review notes or point sheets; (7) interoffice correspondence and/or memoranda relating to topics mentioned in (5) above; (8) permanent files; (9) correspondence to and from SCA Services, Inc., its officers, directors, shareholders, employees or other persons related directly or indirectly with SCA Services, Inc., subsidiaries and affiliates; (10) separate financial statements in your possession of SCA Services, Inc., subsidiaries and affiliates; (11) engagement letters; (12) all billings and time records; (13) papers, documents and other matters used in the preparation of tax returns filed with federal authorities relating to taxes payable on income; and (14) other documents in your possession or under your control relating to the examination of the financial statements of SCA Services, Inc.,

subsidiaries and affiliates for the years ended March 31, 1970, 1971, 1972, 1973, 1974 and 1975.

J. App. 10.

**16.** J. App. 10.

**17.** J. App. 11.

**18.** J. App. 10.

**19.** In one instance, however, appellant did cooperate in the investigation, even after service of the subpoena in suit, by supplying 227 different documents from its files in response to a request from the Commission's staff. J. App. 30–31.

**20.** *SEC v. Arthur Young & Co.*, Misc. No. 76–0098 (D.D.C. July 13, 1976) (unreported) at 2, J. App. 101.

**21.** *Id.* at 3, J. App. 102.

**22.** *Id.* at 3–4, J. App. 102–103.

**23.** *Id.* at 4, J. App. 103.

**24.** A panel of this court denied appellant's motion for a stay of the District Court's order pending appeal. *SEC v. Arthur Young & Co.*, No. 76–1716 (D.C.Cir. Aug. 20, 1976). Appellant and the Commission's staff have agreed upon procedures for production of materials pending resolution of the appeal.

violated, is violating, or is about to violate" provisions of the federal securities laws [25] or "the rules or regulations thereunder . . . ." [26] For that purpose, "any member of the Commission or any officer designated by it is empowered to . . . require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry." [27] Beyond that, in the event of disobedience, the Commission can solicit the hand of the court to exact compliance.[28] These weapons, to be sure, are potent, but hardly dispensable in the protection of the investing public and the fairness and honesty of the Nation's financial markets.

In the case at bar, however, we are first confronted with the claim that the order launching the investigation in suit is fatally lacking in specificity. It is said that the Commission has the responsibility for setting both the scope of its investigations and the limits within which its investigative staff may resort to compulsory process; in appellant's words, that "it is the *Commission* which must determine what basic subjects will be investigated and the areas in which private parties can be compelled to produce documents in connection with such investigations." [29] By what is termed "a vague order of this breadth," [30] appellant argues that "the Commission has left wholly to its staff the determination of what subjects pertaining to SCA will actually be investigated and when compulsion may be used to secure documents in connection with the investigation of these subjects." [31] We do not agree.

Congress has endowed the Commission, not unlike other agencies,[32] with broad power to conduct investigations [33]—"such . . . as it deems necessary to" ferret out violations of the federal securities laws and implementing regulations, whether consummated or incipient [34]—and in that connection to call for production of relevant materials by those who seem to have them.[35] There are, of course, limits; to begin with, "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." [36] Moreover, while the statutory powers of federal regulatory agencies to investigate have traditionally been ex-

**25.** The reference here is to Title 15 of the United States Code, which embraces the entirety of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1976), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1976), within which all statutory provisions relevant to this litigation are to be found.

**26.** Securities Exchange Act of 1934, § 21(a), 15 U.S.C. § 78u(a) (1976).

**27.** "For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or any officer designated by it is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry." Securities Exchange Act of 1934, § 21(b), 15 U.S.C. § 78u(b) (1976). Compare Securities Act of 1933, § 19(b), 15 U.S.C. § 77s(b) (1976).

**28.** Securities Exchange Act of 1934, § 21(c), 15 U.S.C. § 78u(c) (1976).

**29.** Brief for Appellant at 18 (emphasis in original).

**30.** *Id.* at 19.

**31.** *Id.* at 20.

**32.** See 1 K. Davis, Administrative Law Treatise § 3.03 (1958).

**33.** See *In re SEC*, 84 F.2d 316, 318 (2d Cir.), *rev'd and vacated as moot sub nom. Bracken v. SEC*, 299 U.S. 504, 57 S.Ct. 18, 81 L.Ed. 374 (1936); *Boehm v. United States*, 123 F.2d 791, 808 (8th Cir. 1941), *cert. denied*, 315 U.S. 800, 62 S.Ct. 794, 86 L.Ed. 1223 (1942); *Consolidated Mines v. SEC*, 97 F.2d 704, 708 (9th Cir. 1938); *SEC v. First Security Bank*, 447 F.2d 166, 168 (10th Cir. 1971), *cert. denied*, 404 U.S. 1038, 92 S.Ct. 710, 30 L.Ed.2d 729 (1972).

**34.** See text *supra* at notes 25–26.

**35.** See note 27 *supra*.

**36.** *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401, 416 (1950).

tensive,[37] "the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."[38] The federal courts stand guard, of course, against abuses of their subpoena-enforcement processes[39] but constitutional mandates aside,[40] " '[t]he gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.' "[41] Resultantly, it has long been clear that "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."[42]

■ Surely we cannot characterize the challenged investigation as unreasonable. Its stated purpose is to inquire into possible infringements of the securities laws or implementing regulations by "SCA, its officers, directors and employees"[43] or by "any other persons."[44] The predicate for the investigation was a preliminary indication[45] of falsifications or misleading omissions in registration statements, proxy materials and periodic reports filed with the Commission and disseminated to the public.[46] The suspected violations relate to such matters as the interest of SCA's management and others in certain transactions, SCA's financial statements and its descriptions of businesses, properties, acquisitions and dispositions of assets.[47] Despite their apparent breadth—which appellant attacks—these are all areas of legitimate concern to the Commission in the discharge of its statutory responsibilities, and categories of data generally required to be submitted to the Commission and disclosed to the investing public.[48]

37. See 1 K. Davis, Administrative Law Treatise § 3.03 (1958).

38. *See v. City of Seattle,* 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943, 947 (1967). See also *United States v. Morton Salt Co., supra* note 36, 338 U.S. at 652–653, 70 S.Ct. at 369, 94 L.Ed. at 416; *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614, 629 (1946).

39. *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 119–120 (1964); *Oklahoma Press Publishing Co. v. Walling, supra,* note 38, 327 U.S. at 216, 66 S.Ct. at 509, 90 L.Ed. at 634. "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [subpoenaed party] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. at 255, 13 L.Ed.2d at 120. And while the court's role in subpoena enforcement is narrow, see cases cited *supra,* within its confines it is potent:

> A court may always consider such questions as unreasonable searches and seizures, self-incrimination, undue breadth of the subpena, improper inclusion of irrelevant information, administrative authority to make the particular investigation, power to require disclosures concerning activities outside the agency's regulatory authority, and proper issuance of the particular subpena.

1 K. Davis, Administrative Law Treatise § 3.12, at 216 (1958) (footnotes, citing abundant authority, omitted).

40. See text *supra* at note 38.

41. *United States v. Morton Salt Co., supra* note 36, 338 U.S. at 652–653, 70 S.Ct. at 369, 94 L.Ed. at 416, quoting *Oklahoma Press Publishing Co. v. Walling, supra* note 38, 327 U.S. at 208, 66 S.Ct. at 505, 90 L.Ed. at 629.

42. *United States v. Morton Salt Co., supra* note 36, 338 U.S. at 652, 70 S.Ct. at 369, 94 L.Ed. at 416.

43. J. App. 4.

44. J. App. 4.

45. "Even if one were to regard [a] request for information . . . as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." *United States v. Morton Salt Co., supra* note 36, 338 U.S. at 652, 70 S.Ct. at 369, 94 L.Ed. at 416.

46. J. App. 3–4.

47. J. App. 3–4.

48. See Securities Act of 1933, §§ 5, 7, 15 U.S.C. §§ 77e, 77g (1976), *id.* Schedule A(8), (22), (24), (25), (26), 15 U.S.C. § 77aa (1976); Securities Exchange Act of 1934, §§ 12, 13, 14(a), 15 U.S.C. §§ 78*l,* 77m, 77n(a) (1976); 17 C.F.R. § 20.14a (1977).

The Commission submitted to the District Court the affidavit of a staff accountant elucidating lines of inquiry that the Commission proposes to pursue. The affidavit in part recites:

■ We must also discard any notion that the Commission's investigative order is too indefinite as to the documents that its staff might apparently subpoena. Indeed, any such conclusion is foredoomed by our holding that the scope of the investigation itself is adequately bounded.[49] The Commission's subpoena power is coextensive with its investigative power; by statute it may "require the production of any [document] which the Commission deems relevant or material to the inquiry,"[50] and we cannot say that the Commission's interest in the documents demanded of appellant is untoward. The investigation focuses on the financial statements and activities of SCA, a publicly-held corporation, and during the period under scrutiny appellant has been the principal independent accountant for that corporation, examining and certifying what the Commission believes to be inaccurate financial statements. The adequacy of the examinations leading to those certifications thus plainly emerges as a logical and permissible subject of inquiry. We perceive no legal impropriety in a probe into files and records prepared and maintained by appellant in connection with its audits of the questioned financial practices and disclosures for SCA, or of those for others thought to be participants in its suspected misdoings.[51]

■ Appellant's argument, however, takes a somewhat different tack. It is said that the Commission, by allowing exploration of such of SCA's activities as its "[f]inancial statements,"[52] "[d]escription[s] of

---

Certain of the information obtained in the investigation to date indicates that there have been direct and indirect transactions between SCA and present and former management of SCA which may involve a diversion or other misuse of SCA's assets. In this connection, for example, inquiry is being made into (a) substantial advances of cash made by SCA to a company controlled by SCA's former President and the propriety of reporting such advances, in SCA's financial statements for at least fiscal year 1974, as receivables arising from services rendered to that controlled company; (b) the timeliness and adequacy of the disclosure in SCA's annual report for fiscal year 1975 that such receivables did not arise from services rendered and that such receivables were being repaid; and (c) the timeliness and adequacy of SCA's disclosures concerning transactions whereby SCA purchased parcels of land from its former President through straw entities and nominees at prices inflated by about $2.5 million.

J. App. 17. In oral argument before the District Court, Commission counsel undertook a similar explanation. J. App. 46–49, 57–61, 64. Appellant does not question the Commission's power to investigate the subjects specified in the affidavit, but complains that the affidavit purports to justify considerably less than the total demand of the subpoena, with the result that its enforcement should have been correspondingly limited. By our assessment, however, the particulars of the Commission's investigative order, when coupled with the affidavit's disclosure that the investigation extends to the adequacy of appellant's audits, sufficiently specifies the scope of the investigation and reveals that it is at least as broad as the subpoena's call for documents. In this view,

we need not address appellant's further contention that counsel's oral representations to the District Court could not substitute for evidence of investigative scope.

**49.** See text *supra* at notes 29–48.

**50.** See note 27 *supra*.

**51.** "In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar." *United States v. Benjamin*, 328 F.2d 854, 863 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). The role of the accountant in securities transactions is vital. The keystone of the Securities Act of 1933 is its substitution of a policy of disclosure for one of caveat emptor; it closes the "channels of . . . commerce to security issues unless and until a full disclosure of the character of such securities has been made" through a registration statement filed with the Commission. H.R. Rep. No. 85, 73d Cong., 1st Sess. 3 (1933). When Congress pondered the methodology by which disclosure could be ensured, it at one time considered the idea of a corps of federal auditors to examine companies proposing to market securities, but in response to testimony from the accounting profession, see Hearings on S. 875 Before the Senate Comm. on Banking and Currency, 73d Cong., 1st Sess. 55–63 (1933), decided instead to rely on certifications of independent public or certified accountants. See 15 U.S.C. § 77aa, Schedule A(25), (26), (27) (1976). See also Securities Exchange Act of 1934, § 13(a), 15 U.S.C. § 78m(a) (1976).

**52.** See text *supra* at note 12.

business and property"[53] and "[a]cquisition[s] or disposition[s] of assets,"[54] has given its staff carte blanche to examine anything it chooses, and thereby has abdicated its statutory responsibilities. So broadly stated, however, this contention collides with our earlier conclusion that the informational categories designated in the investigative order[55] sufficiently confine the scope of the investigation.[56] Nor can we agree that, to the extent that the task of particularization of documents within those categories involves some exercise of judgment, delegation of that activity to staff officers was forbidden.

We remind once again that Congress has ordained that "[f]or the purpose of any . . . investigation . . ., the production of any [documents] which the *Commission* deems relevant or material to the inquiry" may be required.[57] In its investigative order, the Commission appointed fifteen staff officers to exercise designated functions in connection with the investigation, including the issuance of subpoenas for documents.[58] Appellant concedes that "the Commission need not describe in detail everything that is being investigated . . and can give its staff some discretion and latitude in conducting investigations."[59] With emphasis on the word "Commission" in the statutory authorization, however, appellant insists that "it is the *Commission* which must determine . . . the areas in which private parties can be compelled to produce documents in connection with such investigations."[60]

We would be less than candid if we failed to acknowledge some uncertainty about the precise point at which appellant would draw the line between the delegable and the nondelegable. Since the Commission's investigative order sets areas—four in number—within which the staff purportedly may call for documents,[61] the complaint must again be that the categories designated do not restrict staff discretion tightly enough.

Acceptance of appellant's argument, we think, would stagnate the Commission and frustrate its statutory mission. The Commission constantly engages in large numbers of investigations, each with its own ramifications of informational need. To require Commission members to exercise the substantial amount of supervision that subpoena-detailing would require is to grind its operations to a halt. As the Supreme Court observed three decades ago, "[t]he pyramiding in Washington of all decisions on law enforcement would be apt to end in paralysis,"[62] and how the more so today. Sheer necessity dictates that subordinates direct much of the investigative effort, including document-production effort, else the agency will court disaster. We cannot assume that Congress was oblivious to these considerations, and our duty as judges is to construe the Commission's governing legislation, if at all possible, to avoid an absurd result.[63]

Moreover, provision to a small group of administrators of a sizeable supporting staff is utterly inconsistent with the idea that the administrators themselves are to conduct their business without subdelegation. As one authority has noted, "[t]he single administrator, or the three or five or seven or eleven commissioners, are not provided a staff of five hundred or a thousand or two thousand and then expected to take

---

**53.** See text *supra* at note 12.

**54.** See text *supra* at note 12.

**55.** See text *supra* at note 12.

**56.** See text *supra* at notes 29–48.

**57.** See note 27 *supra* (emphasis supplied).

**58.** J. App. 4.

**59.** Brief for Appellant at 18.

**60.** Brief for Appellant at 18 (emphasis in original).

**61.** See text *supra* at note 12.

**62.** *Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 123, 67 S.Ct. 1129, 1135, 91 L.Ed. 1375, 1385 (1947).

**63.** *Yankee Network v. FCC,* 71 App.D.C. 11, 18, 107 F.2d 212, 219 (1949); *Porter v. Nowak,* 157 F.2d 824, 825–826 (1st Cir. 1946).

all action without subdelegation." [64] We are unable to shed the belief that in conferring upon the Commission power to investigate extensively and to subpoena documents to that end, Congress anticipated that the Commission's members would function more nearly at the level of policy determination, and might permissibly assign the planning and execution of particular projects to the staff.

So, advertent to these considerations and to our responsibility to interpret legislation consistently with its purpose,[65] we conclude that here no less than elsewhere [66] the agency's statutory charter "should be construed so as to give it the administrative flexibility necessary for prompt and expeditious action on a multitude of fronts." [67] We thus reject a construction of the statutory specifications of the Commission's subpoena power that would foreclose subdelegation to selected staff officers of the responsibility for

detailing its exercise. That reading is fully harmonious with—indeed, is buttressed by [68]—a companion provision. With exceptions not pertinent here, the Commission has express statutory leave to subdelegate to subordinates "any of its functions," including "act[ions] as to any work, business, or matter." [69] We have no reason to assume that this provision is to mean less than what it seems plainly to say, or that the subpoena power is somehow impliedly excluded from its ambit.

We realize that in particular instances an administrative subpoena could be overzealous, and we share a natural concern over potential abuse. But the possibility that a subpoena may occasionally be ill-advised in its call is not alone a persuasive reason for introducing impractical limits on subdelegation, which may well generate more problems than it would solve.[70] The Commis-

**64.** 1 K. Davis, Administrative Law Treatise § 9.01, at 616 (1958).

**65.** *United States v. Bornstein*, 423 U.S. 303, 310, 96 S.Ct. 523, 528, 46 L.Ed.2d 514, 522 (1976); *First Nat'l Bank v. Walker Bank & Trust Co.*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343, 349 (1966); *Hudson Distribs., Inc. v. Eli Lilly & Co.*, 377 U.S. 386, 395, 84 S.Ct. 1273, 1280, 12 L.Ed.2d 394, 400 (1964); *Commissioner v. Bilder*, 369 U.S. 499, 504, 82 S.Ct. 881, 884, 8 L.Ed.2d 65, 69 (1962).

**66.** Compare *Fleming v. Mohawk Wrecking & Lumber Co.*, supra note 62, 331 U.S. at 121–122, 67 S.Ct. at 1134–1135, 91 L.Ed. at 1384–1385, distinguishing *Cudahy Packing Co. v. Holland*, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895 (1942); *Plapao Laboratories, Inc. v. Farley*, 67 App.D.C. 304, 305, 92 F.2d 228, 229, cert. denied, 302 U.S. 732, 58 S.Ct. 56, 82 L.Ed. 566 (1937); *Edwards v. NLRB*, 189 F.2d 970 (4th Cir.), cert. denied, 342 U.S. 870, 72 S.Ct. 112, 96 L.Ed. 654 (1951); *NLRB v. Anchor Rome Mills, Inc.,* 197 F.2d 447, 449 (5th Cir. 1952); *NLRB v. John S. Barnes Corp.*, 178 F.2d 156, 159 (7th Cir. 1949); *Penfield Co. v. SEC*, 143 F.2d 746, 749–751, 154 A.L.R. 1027 (9th Cir.), cert. denied, 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (1944).

**67.** *Fleming v. Mohawk Wrecking & Lumber Co.*, supra note 62, 331 U.S. at 122, 67 S.Ct. at 1135, 91 L.Ed. at 1385.

**68.** Compare id. at 120–121, 67 S.Ct. at 1134, 91 L.Ed. at 1384.

**69.** "In addition to its existing authority, the Securities and Exchange Commission, hereinafter referred to as the 'Commission', shall have the authority to delegate, by published order or rule, any of its functions to a division of the Commission, an individual Commissioner, a hearing examiner, or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter . . . ." 15 U.S.C. § 78d–1(a) (1976).

**70.** In *Fleming v. Mohawk Wrecking & Lumber Co.*, supra note 62, 331 U.S. at 123, 67 S.Ct. at 1135, 91 L.Ed. at 1385, Justice Douglas, speaking for the majority, observed that "[t]o tempt the Administrator to solve the problem by supplying all his offices with subpoenas signed in blank would not further the development of orderly and responsible administration." Justice Jackson concurring, remarked:

If the Administrator may not delegate his power to sign subpoenas but must personally sign all subpoenas issued in the process of enforcement throughout the United States, one of two practices would be certain to result. He must sign large batches of blank subpoenas and turn them over to subordinates to be filled in over his signature. Or he might sign batches of subpoenas already made out by subordinates, probably without reading them and certainly without examining the causes for their issuance or the scope of the information required. The personal signature of the Administrator on the

sion is itself amply equipped, through its inherent powers to control and rectify the activities of its subordinates, to arrest any irresponsible uses to which its subpoena may be sought to be put. And so long as the courts retain their power of individual inquiry prior to enforcement of administrative subpoenas, there is relatively little for anyone to fear.[71]

### III

■ Another precondition to judicial enforcement of an administrative investigative subpoena is that the documents demanded bear relevance to some subject of the investigation.[72] In the instant case, the District Court was

convinced that in this case of a broadly based investigation into a complex subject matter, the subpoena request is not so overbroad as to reach into areas irrelevant or immaterial. The materials sought relate to Arthur Young's auditing and other work for SCA and for other individuals, corporations and trusts with whom SCA may have had dealings. The Commission is investigating alleged looting of SCA assets and self-dealing by SCA insiders through a scheme of selling over-priced property to SCA· by SCA insiders. The Commission has also indicated that it is investigating Arthur Young's role in preparing the financial statements of SCA. In this regard the materials sought are not clearly irrelevant or immaterial. This being the case,

the Commission has made sufficient showing of the relevancy of these materials to justify the Court's enforcement of the subpoena.[73]

Appellant attacks this holding on several grounds, in none of which are we able to concur.

The focal point of the present challenge, like that earlier,[74] is the quantity of data requisitioned by the Commission's subpoena. To reiterate, it asks for all documents in 14 categories amassed over a six-year period in connection with appellants' examinations of financial statements of SCA, its subsidiaries and affiliates,[75] and, to the extent applicable, (a) for "any special engagements projects or management consulting services";[76] (b) for another named corporation, its subsidiaries and affiliates;[77] (c) for an additional 28 named individuals and entities;[78] and (d) for all present and past officers, directors, and employees of SCA.[79] A closer look reveals, however, that the scope of the demand is not nearly as broad as at first blush it might seem. The Commission argues forcefully, and appellant does not directly refute, that the 14 categories together comprise but one coherent set of work papers and ancillary materials routinely generated and assembled in any audit.[80] And although the subpoena's call extends beyond SCA and its affiliates to 29 persons and entities and the full range of SCA personnel, the record discloses that appellant has refused to say whether it has

---

subpoena under those circumstances is no protection to individual rights.

*Id.* at 123–124, 67 S.Ct. at 1135–1136, 91 L.Ed. at 1386.

71. Compare *id.* at 124, 67 S.Ct. at 1136, 91 L.Ed. at 1386 (concurring opinion).

72. *United States v. Powell, supra* note 39, 379 U.S. at 57, 85 S.Ct. at 255, 13 L.Ed.2d at 119; *United States v. Morton Salt Co., supra* note 36, 338 U.S. at 652, 70 S.Ct. at 369, 94 L.Ed. at 416; *Oklahoma Press Publishing Co. v. Walling, supra* note 38, 327 U.S. at 209, 66 S.Ct. at 506, 90 L.Ed. at 630; *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974).

73. *SEC v. Arthur Young & Co., supra* note 20, at 2, J. App. 101 (citations omitted).

74. See Part II *supra.*

75. J. App. 10.

76. J. App. 10.

77. J. App. 10.

78. J. App. 10–11.

79. J. App. 11. We are told that for fiscal year 1975 SCA had approximately 6,900 employees. Brief for Appellant at 25 n.23.

80. Brief for Appellee at 23.

performed any work for any of them during the period under investigation,[81] and this wall of silence leaves appellant in much poorer position to press a claim of overbreadth. Obviously no production is required vis-a-vis those whom appellant has not served; and, on the other hand, as much of the subpoenaed materials as may be in appellant's possession lies within the ambit of the investigation because the entities and persons for whom they are retained—despite their number—are ostensibly implicated in the questioned SCA financial operations.[82]

■ Thus we get to the gist of the matter. The investigation is ambitious, yet, as we have held, it is within the Commission's statutory domain.[83] Because the investigation is broad the subpoena's production effort is broad, yet it is no broader. Put another way, though a response to the subpoena may produce a large volume of data, the Commission has established prima facie its potential importance in terms of the investigative objectives. That, we think, is enough.

■ To begin with, we disagree with appellant that the District Court utilized an erroneous standard in passing on the issue of relevance. The court held that "the materials sought are not clearly irrelevant or immaterial."[84] Appellant asserts that this test stands the burden of proof on its head—that "before an agency subpoena may be enforced, the agency must prove, inter alia, that the documents sought in a subpoena are 'relevant to the purpose' of the matter under investigation."[85] For our part, the difference between the two formulations is chiefly semantical, and certainly is legally inconsequential. The Supreme Court has rebuffed a challenge to the scope of an investigative subpoena when "[t]he evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose . . . ."[86] We ourselves have enforced such a subpoena when "we [could] not say that the requested information is plainly irrelevant to the charges contained in the complaint."[87] To treat "relevant" and "not clearly irrelevant" as dichotomous[88] is to overlook the role of relevance as merely the refined expression of one of several elements of a reasonable documental demand.[89] It can hardly be seriously suggested that a request for documents "not plainly irrelevant" is unreasonable.[90]

Carefully analyzed, appellant's stance on relevance is largely another outcropping of its distaste for the size of the production summoned. The essence of its claim is that the Commission has embarked upon an illegal fishing expedition into its files. That would have been a potent argument in the

---

81. J. App. 56–61.

82. See Part II *supra.*

83. Part II *supra.*

84. See text *supra* at note 73.

85. Reply Brief for Appellant at 10, quoting *United States v. Powell, supra* note 39, 379 U.S. at 57, 85 S.Ct. at 255, 13 L.Ed.2d at 119 (emphasis in original).

86. *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424, 429 (1943) (emphasis supplied).

87. *Moore Business Forms, Inc. v. FTC,* 113 U.S. App.D.C. 231, 232, 307 F.2d 188, 189 (1962) (emphasis supplied).

88. Surely that should not be done here, where the District Court's use of "not clearly irrelevant or immaterial" came only after it had unambiguously declared that it would "enforce the Commission's subpoena if . . . the materials sought are relevant to [the] investigation." *SEC v. Arthur Young & Co., supra* note 20, at 2, J.App. 101.

89. See text *supra* at notes 36–42.

90. Compare *CAB v. Hermann,* 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957), directing enforcement of subpoenas when the District Court "found that it could not say 'that any of the documents or things called for in any of the subpoenas are immaterial or irrelevant . . .'" *Id.* at 323, 77 S.Ct. at 805, 1 L.Ed.2d at 853. As the Supreme Court read the District Court's order, "it duly enforced the [agency's] right to call for documents relevant to the issues of the [agency's] complaint . . . ." *Id.*

early era of administrative law [91] but it retains scarcely any of its clout today. As Professor Davis observes, "[t]he older cases strongly condemn roving inquiries into private books and records, but the recent cases permit such roving inquiries to whatever extent seems to be necessary to make the power of investigation effective." [92] And as far back as a quarter-century the Supreme Court, addressing the contention that an agency was "engaged in a mere 'fishing expedition' to see if it can turn up evidence of guilt," [93] commented expansively:

> We will assume for the argument that this is so. Courts have often disapproved the employment of the judicial process in such an enterprise. . . .
>
> We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan "no fishing expeditions." It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and error to fit this process into our system of judicature. More recent views have been more tolerant of it than those which underlay many older decisions.[94]

Continuing, the Court elucidated:

> [A]n administrative agency . . . has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analo-

gous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.[95]

So, "[e]ven if one were to regard the request for information . . . as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." [96]

▮ Today, then, "[t]he gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable." [97] Correspondingly, the need for moderation in the subpoena's call is a matter of reasonableness:

> [T]he requirement of reasonableness . . . comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, . . . this cannot be reduced to [a] formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry.[98]

We are mindful, too, that investigative breadth and relevance of sought-after documents—each a vital consideration in subpoena enforcement—are closely related:

**91.** See, e. g., Hale v. Henkel, 201 U.S. 43, 76–77, 26 S.Ct. 370, 379–380, 50 L.Ed. 652, 666 (1906); FTC v. American Tobacco Co., 264 U.S. 298, 305–307, 44 S.Ct. 336, 337–338, 68 L.Ed. 696, 700–701 (1924).

**92.** 1 K. Davis, Administrative Law Treatise § 3.06, at 183 (1958).

**93.** United States v. Morton Salt Co., supra note 38, 338 U.S. at 641, 70 S.Ct. at 363, 94 L.Ed. at 410.

**94.** Id. at 641–642, 70 S.Ct. at 363–364, 94 L.Ed. at 410.

**95.** Id. at 642–643, 70 S.Ct. at 364, 94 L.Ed. at 411.

**96.** Id. at 652, 70 S.Ct. at 369, 94 L.Ed. at 416.

**97.** Oklahoma Press Publishing Co. v. Walling, supra note 38, 327 U.S. at 208, 66 S.Ct. at 505, 90 L.Ed. at 629.

**98.** Id. at 209, 66 S.Ct. at 506, 90 L.Ed. at 630.

The breadth of an investigation is for the investigators to determine. The breadth of a subpoena or of a search made in records may be excessive, but the test is relevance to the specific purpose, and the purpose is determined by the investigators.[99]

Here, as the District Court correctly stated, the Commission has launched "a broadly based investigation into a complex subject matter,"[100] and we have found it both statutorily authorized and reasonable.[101] It is designed to ascertain whether the federal securities laws or the Commission's regulations have been transgressed;[102] with that aim, it will explore the interrelationships, direct and indirect, of SCA and a number of individuals and entities in a variety of transactions.[103] Appellant, as SCA's chief independent accountant, prepared and certified for SCA publicly-filed and -disseminated statements thought to be inaccurate, a matter upon which appellant's subpoenaed work papers and ancillary materials could be revealing. They promise to reflect also upon the caliber of appellant's performances in SCA's behalf, and as well upon the nature and extent of any participation in SCA's financial activities by other suspects who might happen to be clients of appellant. These circumstances forge a prima facie case of pertinence of the subpoenaed documents to the ends of the investigation, a showing which appellant, by choice, has not undertaken to rebut. We hold that the requirement of relevance has been met.

## IV

Lastly, appellant complains that the subpoena in suit imposes an unconscionable burden, in the constitutional as well as the ordinary sense. We do not doubt that in particular instances administrative subpoenas for document-production could have just that effect. As we have already observed, the Fourth Amendment demands of subpoenas not only relevance in purpose and specificity in command but also such limitation in scope "that compliance will not be unreasonably burdensome."[104] And we agree that "while the [Commission] is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably . . . ."[105]

Undeniably, the response to the instant subpoena will necessitate a great deal of effort. An uncontroverted affidavit in the record avows that appellant's personnel will have to examine, at more than 15 different offices of the firm[106] and at a cost estimated at more than $100,000, some 2,000 work binders and over 200 correspondence files which when stacked would extend more than 275 lineal feet.[107] On the other side of a ledger, however, are considerations militating against appellant's contention that the subpoena's call is undue. The Commission's investigative power, we have noted, is broad;[108] the materials here sought, we have held, are relevant to an authorized inquiry;[109] and resultantly a demonstration of excessive burden would be hard to come by.[110]

Moreover, the District Court, recognizing that compliance would impose "a heavy burden . . . on a party, which, though involved in the Commission's investigation, is not the primary target of that

---

**99.** 1 K. Davis, ·Administrative Law Treatise § 3.06, at 188–189 (1958).

**100.** See text *supra* at note 73.

**101.** See Part II *supra*.

**102.** J.App. 4.

**103.** J.App. 4.

**104.** See text *supra* at note 38.

**105.** *SEC v. Brigadoon Scotch Distrib. Corp.,* *supra* note 72, 480 F.2d at 1056.

**106.** This is so notwithstanding that a majority of the materials are kept at ten of appellant's offices. J.App. 32–33. See note 8 *supra*.

**107.** J.App. 33.

**108.** See text *supra* at notes 32–35.

**109.** See Part III *supra*.

**110.** Compare *SEC v. Brigadoon Scotch Distrib. Corp., supra* note 72, 480 F.2d at 1056.

investigation," [111] took steps to reduce it. The court's enforcement order compels appellant to produce documents for Commission inspection only at the offices at which in the ordinary course of business they are kept. [112] Beyond that, appellant is freed from any obligation to copy for the Commission's benefit any document temporarily released for that purpose. [113] But, as the order explicates, appellant must copy for the Commission those documents it wishes to retain continuously in its possession. [114] For reasons we cannot deem insubstantial, [115] appellant insists that the conditions imposed by the District Court would not accomplish enough.

Momentarily at least, we need not ponder on just what decision would be proper on burden were it not further ameliorated, for in our view another factor merits additional study. The financial cost of compliance with the subpoena is principally if not entirely the burden complained of, a circumstance accented by appellant's argument that enforcement—if forthcoming at all—should be made to depend upon reimbursement of the expense incurred. [116] No less than the District Court, we recognize the

value of feasible conditions in the effort to minimize the onus of subpoena-compliance, [117] and it is evident that cost-reimbursement could make a great deal of difference here. Continuing, then, the process begun by the District Court, we pause to consider how far reimbursement of appellant's expense of compliance may have a rightful role in the situation before us.

The power to impose a condition of that sort has achieved recognition, [118] though its source and the predicates for its exercise are less clearly defined. Rationales suggested by appellant extend to contentions that visitation of a heavy burden of obedience amounts to an unreasonable search and seizure violative of the Fourth Amendment, or alternatively to a taking of property without just compensation or due process of law in contravention of the Fifth. [119] We need not range so far, however, to find the authority that appellant invokes.

■■■ Enforcement of administrative subpoenas has long been committed, not to administrative tribunals themselves, but instead to the courts. [120] Power to enforce

---

**111.** *SEC v. Arthur Young & Co., supra* note 20, at 3, J.App. 102.

**112.** *Id.* at 3–4, J.App. 102–103.

**113.** *Id.*

**114.** *Id.* at 4, J.App. 103.

**115.** See text *infra* at notes 129–133.

**116.** Brief for Appellant at 33–36; Reply Brief for Appellant at 12–14.

**117.** See *CAB v. Hermann, supra* note 90, 353 U.S. at 323, 77 S.Ct. at 805, 1 L.Ed.2d at 853; *Bank of America v. Douglas,* 70 App.D.C. 221, 228, 105 F.2d 100, 107, 123 A.L.R. 1266 (1939); *United States v. Dauphin Deposit Trust Co.,* 385 F.2d 129, 131 (3d Cir. 1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); *United States v. Continental Bank & Trust Co.,* 503 F.2d 45, 48 (10th Cir. 1974).

**118.** See *United States v. Davey,* 543 F.2d 996, 1000 (2d Cir. 1976); *United States v. Davey,* 426 F.2d 842, 844–845 (2d Cir. 1970); *United States v. Friedman,* 532 F.2d 928, 936–937 (3d Cir. 1976); *United States v. Farmers & Merchants Bank,* 397 F.Supp. 418, 420–421 (C.D. Cal.1975), *appeal docketed,* No. 75–3690 (9th

Cir.). Cf. *United States v. Dauphin Deposit Trust Co., supra* note 117, 385 F.2d at 130; *United States v. Continental Bank & Trust Co., supra* note 117, 503 F.2d at 48; *United States v. First Nat'l Bank,* 173 F.Supp. 716, 720–721 (W.D.Ark.1959).

**119.** These arguments, upon which we have no occasion to intimate an opinion, have frequently been discarded, usually on the facts of the particular case. *United States v. Dauphin Deposit Trust Co., supra* note 117, 385 F.2d at 130; *United States v. Friedman, supra* note 118, 532 F.2d at 934–935; *United States v. Continental Bank & Trust Co., supra* note 117, 503 F.2d at 48. But see *United States v. Farmers & Merchants Bank, supra* note 118, 397 F.Supp. at 420–421.

**120.** "The inquiry whether a witness before the [Interstate Commerce] Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination." *ICC v. Brimson,* 154 U.S. 447, 485, 14 S.Ct. 1125, 1136, 38 L.Ed. 1047, 1060 (1894).

subpoenas of the Securities and Exchange Commission is cast in this traditional mold, without limitation on the court's discretion to set terms ensuring that the enforcement order does not become an engine of oppression.[121] Stated somewhat differently, judicial authority to temper enforcement with fairness stems inexorably from congressional entrustment of subpoena enforcement to the judiciary.[122] Surely, then, in formulating protective conditions for administrative subpoenas, courts may resort analogously to techniques conventional to judicial subpoenas,[123] and thus in safeguarding against undue financial outlays may appropriately insist upon a reasonable measure of reimbursement.[124]

As appellant readily concedes, considerations of fairness do not call for reimbursement in every instance, or necessarily for full reimbursement in any given case.[125] There is a continuing general duty to respond to governmental process; in consequence, subpoenaed parties can legitimately be required to absorb reasonable expenses of compliance with administrative subpoenas.[126] It follows that the power to

exact reimbursement as the price of enforcement is soundly exercised only when the financial burden of compliance exceeds that which the party ought reasonably be made to shoulder.[127] And what is reasonable will depend—as over the legal spectrum it ultimately does—upon the circumstances of each case.[128] With these concerns in mind, we turn to appellant's claim that the enforcement order under review should provide for reimbursement in a more generous degree than it does.

Appellant represents that compliance with the subpoena, even as conditioned by the District Court, potentially involves costs exceeding $100,000,[129] of which $84,000 expectably will be for document-duplication alone.[130] And while under the enforcement order propounded by the District Court, appellant can reduce and even eliminate the $84,000 item by turning originals over to the Commission for copying at its own expense,[131] for appellant that is not an acceptable option. An affidavit presented to the District Court stated that many of the subpoenaed documents were needed in connection with a current audit and that their release, even for a brief period, could seri-

---

**121.** See Securities Exchange Act of 1934, § 21(c), 15 U.S.C. § 78u(c) (1970).

**122.** *United States v. Friedman, supra* note 118, 532 F.2d at 936–937.

**123.** With respect to the latter, Fed.R.Civ.P. 45(b) specifies:

A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) *quash or modify the* subpoena if it is unreasonable and oppressive or (2) *condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable costs of producing the books, papers, documents, or tangible things.*

(emphasis supplied). This provision "disclos[es] a broad congressional judgment with respect to fairness in subpoena enforcement proceedings." *United States v. Friedman, supra* note 118, 532 F.2d at 937.

**124.** *United States v. Friedman, supra* note 118, 532 F.2d at 937.

**125.** Reply Brief for Appellant at 12 n.17.

**126.** *United States v. Davey, supra* note 118, 543 F.2d at 1001; *United States v. Dauphin Deposit Trust Co., supra* note 117, 385 F.2d at 130; *United States v. Friedman, supra* note 118, 532 F.2d at 937; *United States v. Continental Bank & Trust Co., supra* note 117, 503 F.2d at 48.

**127.** *United States v. Davey, supra* note 118, 543 F.2d at 1000–1001; *United States v. Dauphin Deposit Trust Co., supra* note 117, 385 F.2d at 130; *United States v. Friedman, supra* note 118, 532 F.2d at 938. *Cf. United States v. Continental Bank & Trust Co., supra* note 117, 503 F.2d at 48.

**128.** *United States v. Friedman, supra* note 118, 532 F.2d at 937–938. Compare *United States v. Davey, supra* note 118, 543 F.2d at 1001.

**129.** J.App. 33.

**130.** Brief for Appellant at 31–32.

**131.** See text *supra* at notes 22–23. Compare *United states v. Dauphin Deposit Trust Co., supra* note 117, 385 F.2d at 131; *United States v. Continental Bank & Trust Co., supra* note 117, 503 F.2d at 48.

ously interfere with that effort;[132] and we have no basis for an assumption that such a need for retention does not recur. To boot, appellant tells us that on previous occasions it has lent documents to the Commission that were then either lost or destroyed.[133] The Commission does not dispute the importance to an independent accounting firm of ready access to its audit work papers, nor does the Commission deny the claim that in the past it has failed to return materials borrowed from appellant. In this milieu, appellant's insistence upon retention of its originals is understandable, and hardly supports an outright denial of reimbursement for copying costs.

Nonetheless, we are unable at this time to rule affirmatively that appellant is entitled to reimbursement, for its actual future expenses conceivably could fall far short of its present projection. Its estimate will be vindicated only if the Commission designates every subpoenaed document for copying; furthermore, appellant computes duplication expense at 20 cents per page.[134] We cannot ignore the possibility that ultimately the Commission may settle for a much smaller number of documents, that appellant may spend less per page than originally anticipated, or that the rate may not be entirely reasonable.[135] These are among the uncertainties in the present record cautioning against an undertaking to assess now whether or to what extent reimbursement might be in order.

 There is no need to speculate in this regard. Appellant has expressed its willingness to postpone recoupment of its expenses until after full production in response to this opinion [136]—when of course, the problems of reimbursement could readily be determined. More fundamentally, however, appellant's offer to defer the day of financial reckoning to that point is a concession the Commission cannot demand of right. Judicial power to condition subpoena-enforcement upon expense-absorption, by its very nature, extends to requiring step-by-step reimbursement concurrently with document-production at any stage that the producing party has already been put to substantially more than his fair share of the costs of obedience.[137] The enforcing court has ample discretion to make certain that one possessing subpoenaed material will not for any inordinate period be out-of-pocket more than a reasonable amount.[138]

We modify the District Court's enforcement order, then, to afford appellant the opportunity to show that the actual expense of compliance with the Commission's subpoena has at any given time become unreasonable and to seek reimbursement accordingly.[139] For reasons earlier discussed,[140] we affirm the judgment at thus modified.

*So ordered.*

---

**132.** J.App. 33.

**133.** Brief for Appellant at 31.

**134.** Brief for Appellant at 32.

**135.** The 20-cent per-page estimate is not supported either as to amount or reasonableness by any evidence in the record.

**136.** Reply Brief for Appellant at 14.

**137.** *Cf.* Fed.R.Civ.P. 45(b), quoted in note 123 *supra.* We need not decide whether judicial enforcement of administrative subpoenas may be conditioned upon advance payment of compliance costs. 31 U.S.C. § 529 (1976) provides in relevant part that "[n]o advance of public money shall be made in any case unless authorized by the appropriation concerned or other law." See *Alcoa Steamship Co., Inc. v. United States,* 338 U.S. 421, 425 and n.6, 70 S.Ct. 190, 192 and n.6, 94 L.Ed. 225, 230 and n.6 (1949). See also *Warren v. United States,* 340 U.S. 523, 526, 71 S.Ct. 432, 434, 95 L.Ed. 503, 508 (1951) ("[t]he term law in our jurisprudence usually includes the rules of court decisions as well as legislative acts.").

**138.** The parties should first endeavor to reach an understanding on the matter. If they are unable to agree, the court's authority to condition enforcement upon expense-sharing can be invoked. Procedurally, the court would ascertain (a) whether agency-sharing of the expense is appropriate, text *supra* at notes 116–124, and if so (b) the extent to which it should share, text *supra* at notes 125–128, and (c) when it should share. The theme of cost-sharing orders should be flexibility.

**139.** Relevance of the sought-after data appearing, Part III *supra,* appellant will have the burden of demonstrating excessive cost of compliance. *United States v. Davey, supra* note 118, 543 F.2d at 1000.

**140.** In Parts II, III.