**In the Matter of an Application to Enforce Administrative Subpoena Duces Tecum of the SECURITIES AND EXCHANGE COMMISSION**

v.

**OKC CORP.**

**Civ. A. No. CA 3–79–0412–G.**

United States District Court,
N. D. Texas,
Dallas Division.

June 8, 1979.

Michael J. Stewart and David A. Watson, Steven K. McGinnis, Fort Worth, Tex., for Securities and Exchange Commission.

G. Scott Damuth, Robert A. Miller, Attys., Arthur Mitchell, General Counsel, OKC Corp., Dallas, Tex., Ford, Marrin, Esposito & Witmeyer, New York City, for OKC Corp.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

On March 27, 1978, the Securities and Exchange Commission issued an order directing an investigation of OKC Corporation to determine among other things whether certain persons, in connection with the offer and sale of securities, had violated

or were about to violate the antifraud and reporting provisions of §§ 10(b) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(a), and Rules 10b–5, 13a–1, and 13a–13 promulgated thereunder.

OKC Corporation filed suit in this court on August 15, 1978, *OKC v. Williams*, 461 F.Supp. 540 (D.C.1978) seeking to enjoin the SEC from using in its investigation a report prepared for OKC by the law firm of Locke, Purnell, Boren, Laney & Neely.[1] The SEC agreed not to proceed with its use of the report and its investigation of OKC until this court's resolution of the issues presented in Phase I of that proceeding. In Phase I, the court addressed the question of whether the SEC in obtaining and using the report violated OKC's Fourth Amendment rights; it found no violation and declined to grant the preliminary injunction that OKC had sought. The SEC, before this court's final Phase I ruling, issued a subpoena duces tecum to OKC requiring the production of certain documents.[2] This court finally resolved all Phase I matters on February 22, 1979; on February 23, 1979, the SEC informed OKC that it would require compliance with the subpoena on March 15, 1979. On March 15, 1979, OKC failed to produce the subpoenaed documents and the SEC filed the instant enforcement action shortly thereafter.[3]

OKC attacks the subpoena in question on numerous grounds: that the subpoena is unreasonable under the Fourth Amendment; that the Department of Energy's (DOE's) referral of certain matters to the Department of Justice for criminal prosecution precludes further civil investigation; that enforcement of the subpoena will infringe the attorney-client privilege; that the investigation itself violates OKC's Fourth Amendment rights; that the SEC is proceeding in a manner that will prejudice OKC's rights on appeal; and that the SEC

is conducting an accusatory proceeding in violation of OKC's due process rights. This court finds all of OKC's contentions to be without merit and grants the SEC's motion to enforce its subpoena duces tecum.

### I. The Fourth Amendment

■ OKC's contention that the subpoena constitutes an attempt to conduct a boundless "carte blanche" inquiry that is unreasonable under the Fourth Amendment is without merit. It is well established that the scope of an administrative agency's investigatory power is broad. In *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Supreme Court compared an agency inquiry to that of a grand jury which can investigate without probable cause but "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642–43, 70 S.Ct. at 364.

Despite the broad investigatory authority, an administrative agency's subpoena power is not limitless. Rather the Fourth Amendment demands that the investigation be conducted pursuant to a legitimate, Congressionally authorized purpose and that the subpoena be relevant to that purpose. *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *United States v. Morton Salt Co., supra*, 338 U.S. at 652, 70 S.Ct. 357. Further, the necessary statutory procedures must be followed and the information sought must not be already within the agency's possession. *United States v. Powell, supra*, 379 U.S. at 57–58, 85 S.Ct. 248.

The official purpose of the SEC's investigation of OKC clearly is Congressionally authorized. The Commission is empowered to conduct investigations to determine whether any person has violated or is about

---

1. OKC also raised other issues, some of which the court has not yet resolved.

2. That subpoena was issued after the court initially granted partial summary judgment on February 3, 1979. The court, after the subpoena was issued, reconsidered and modified its original holding on February 22, 1979.

3. The parties in their briefs have referred repeatedly to evidence introduced in *OKC v. Williams*. The court in this opinion will regard that evidence as being before it.

to violate the securities laws. 15 U.S.C. § 78u(a). On March 27, 1978, the SEC issued an Order of Investigation of OKC. That order states that the investigation's purpose is to determine whether OKC and others have engaged or are about to engage in conduct in violation of the antifraud and periodic reporting requirements of the Securities Exchange Act.

■ OKC contends, however, that the actual purpose of the SEC's investigation is improper because the SEC's ultimate aim is to make a criminal reference. It thus challenges the SEC's good faith. The Supreme Court in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), emphasized that the issue of good faith revolves around whether the agency in an institutional sense has abandoned its pursuit of civil action, and not whether certain individual employees of the agency who are involved in the investigation are gathering evidence solely for a criminal prosecution. In this case, the mere fact that certain employees of the SEC may have expressed concern about the running of the criminal statute of limitations—a fact that OKC points to as proof of bad faith—is certainly not enough to establish that the institution as a whole has abandoned the possibility of civil action. Indeed, the deposition testimony of Michael J. Stewart, Administrator of the Fort Worth Regional Office of the SEC and of Cecil Mathis, that Office's Assistant Administrator for Enforcement demonstrates that the SEC staff has made no recommendation to the Commission as to any further proceedings involving OKC. OKC's challenge to the purpose of the investigation is not convincing.[4]

OKC, in attacking the relevancy of the SEC's requests, accuses the Commission of issuing a subpoena that is so broad that its enforcement would have the effect of empowering the SEC "to subpoena at will all the records of every corporation to determine if a material fact somewhere exists which might arguably be such that it should

have been recited in the narrative position of a corporation's SEC filings, but which was not."

The SEC's subpoena is much more specific than OKC would have this court believe. Rather than requesting all records and documents, the subpoena demands certain specific matters: (1) documents relating to petroleum transactions between OKC and seven entities for a specified five-year period; (2) documents relating to petroleum transactions during five different periods, the longest of which is 41 days; (3) inventory charts relating to the same period of days; (4) monthly financial statements for a five-year period; (5) documents concerning OKC receivables from employees for a five-year period; (6) documents relating to financial transactions between OKC and seven entities for a five-year period; and (7) claims in bankruptcy filed on OKC's behalf.

This subpoena thus presents a significantly different situation from those in the cases on which OKC relies, *United States v. Coopers & Lybrand*, 550 F.2d 615 (10th Cir. 1977) and *C.A.B. v. United Airlines, Inc.*, 542 F.2d 394 (7th Cir. 1976). In *Coopers & Lybrand* the IRS was auditing Johns-Manville Corp. for the years 1971 and 1972 and subpoenaed certain documents from Coopers & Lybrand, the certified public accounting firm engaged to audit and report on Johns-Manville's financial statements. Among the documents requested were the "audit program" and "taxpool analysis" file. The court held that those documents were not relevant because they had not been used to prepare the taxpayer's 1971 or 1972 tax return. In *United Airlines*, CAB agents appeared at the executive offices of United and demanded immediate access "to all records and documents located on the premises." The court, denying the agents' request, emphasized that they were neither acting pursuant to an agency order describing the investigation nor demanding specific documents pursuant to a subpoena. Unlike the subpoenas in these two cases the one in this case de-

---

**4.** OKC also contends that the purpose of the investigation is to supply a pending criminal

prosecution with evidence. The court addresses this question in the following section.

mands specific documents that pertain to a legitimate investigation that was instituted pursuant to an agency order.

█ The standard to be applied in determining whether the subpoenaed documents are irrelevant is whether they are "plainly incompetent or irrelevant to any lawful purpose." *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943).[5] In applying this standard, the court is mindful of the Congressional directive that the Commission may subpoena "[f]or the purpose of any . . investigation . . . , the production of any [documents] which the *Commission* deems relevant or material to the inquiry," Securities Exchange Act of 1934, § 21(b), 15 U.S.C. § 78u(b), (emphasis added). This directive, of course, does not mean that federal courts must invariably bow to the Commission in its assessment of what is relevant. Unless it appears from the face of the subpoena that the matters sought do not pertain to the official subject of the investigation, however, a court should be reluctant to declare the subpoenaed documents irrelevant. Indeed, the trend in recent cases has been to permit inquiries to whatever extent is necessary to make effective the power of investigation. *SEC v. Arthur Young & Co.*, 190 U.S.App.D.C. 37, 49, 584 F.2d 1018, 1030 (1978); *see* 1 K. Davis, Administrative Law Treatise § 3.06, at 183 (1958). This court finds that the documents that the SEC here seeks are within its subpoena power and relevant to its investigation.

Finally, the subpoena complies with *Powell's* requirement that it be issued according to statutory procedures. Title 15 U.S.C. § 78u(b) authorizes the SEC, in connection with the agency investigation, to designate officers to subpoena witnesses, take evidence, and require the production of any books, papers, correspondence, and memoranda that the Commission deems relevant to its inquiry. The SEC issued the subpoena in question pursuant to an agency order authorizing a legitimate agency investigation; it thus falls within 15 U.S.C. § 78u(b).

█ OKC further contends that even if the subpoena is otherwise proper, it imposes an unreasonable burden. The law is clear that "while the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably . . . [I]f it could be demonstrated that compliance with an agency subpoena would be *unnecessarily* burdensome, some limitation of the materials required would be warranted." *SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973). OKC, however, has the burden of showing that the subpoena is unreasonable. *See United States v. Powell, supra*, 379 U.S. at 58, 85 S.Ct. 248; *Donaldson v. United States*, 400 U.S. 517, 527, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). Where, as here, the agency inquiry is Congressionally authorized and the documents sought are relevant to the investigation, that burden is not easily satisfied. *SEC v. Brigadoon Scotch Dist. Co., supra*, 480 F.2d at 1056.

█ OKC, to meet this burden, contends that production of documents would be excessively expensive and duplicative. Estimating that the cost of complying with the subpoena will be $100,000,[6] OKC further argues that the SEC should bear the expense of whatever compliance, if any, this court orders. The general rules are well established that expense alone does not render a subpoena unreasonable and that the recipient of a subpoena duces tecum is required to bear the costs of compliance.

Since some costs can be anticipated in complying with any subpoena duces tecum, Rule 17(c)'s provision that the court

---

5. The difference between this standard and that of "relevance" has been construed as being chiefly semantical. *SEC v. Arthur Young & Co.*, 190 U.S.App.D.C. 37, 48, 584 F.2d 1018, 1029 (D.C.Cir. 1975).

6. It should be noted that the affidavit of Robert Miller, apparently submitted to support OKC's contention that compliance will be burdensome, is of questionable value. Laced with qualifications that indicate a lack of personal knowledge, the affidavit tends to support the view that OKC itself is not certain how burdensome compliance will be.

may quash a subpoena "if compliance would be unreasonable or oppressive" must be read to mean that in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence. *In re Grand Jury No. 76–3 (MIA) Subpoena Duces Tecum,* 555 F.2d 1306, 1308 (5th Cir. 1977). *See Hurtado v. United States,* 410 U.S. 578, 590, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973); *Petroleum Exploration, Inc. v. Public Service Commission,* 304 U.S. 209, 222, 58 S.Ct. 834, 82 L.Ed. 1294 (1938). On the other hand, it has been recognized that under certain circumstances a court may impose costs on the government, or may otherwise set the terms of compliance so as to ensure that an enforcement order does not become a means of oppression or harassment. *See* Securities Exchange Act of 1934, § 21(c), 15 U.S.C. § 78u(c) (1970); *SEC v. Arthur Young & Co.,* 190 U.S.App.D.C. 37, 51, 584 F.2d 1018, 1032 (D.C.Cir. 1978); *United States v. Davey,* 543 F.2d 996, 1000 (2d Cir. 1976); *United States v. Friedman,* 532 F.2d 928, 936–37 (3rd Cir. 1976). Only when the financial burden of compliance exceeds that which a party ought reasonably be made to shoulder in light of the facts and circumstances of the particular case, however, should the court impose on the government the duty of reimbursement. *SEC v. Arthur Young & Co., supra,* 190 U.S.App.D.C. at 52, 584 F.2d at 1033; *United States v. Davey, supra,* 543 F.2d at 1000–01; *United States v. Friedman, supra,* 532 F.2d at 938.

The court does not find in light of the facts of this case that the expense of complying with the subpoena will exceed that which OKC reasonably ought to bear. Any disputes that arise between the parties concerning duplicative production will be referred to a magistrate.

## II. The Grand Jury Investigation

OKC contends that the DOE's reference of certain matters to the office of the United States Attorney for criminal prosecution precludes as a matter of law the enforcement of any agency subpoena. The argument is based upon a misapplication of the decisions of the Supreme Court in *United States v. LaSalle National Bank, supra,* and *Donaldson v. United States, supra.* Although both decisions prohibit the enforcement of agency subpoenas issued after a criminal reference has been made, an examination of the decisions reveal that they do not require a holding here that the SEC subpoenas need not be complied with.

In *Donaldson,* the taxpayer argued that an Internal Revenue summons could not be utilized in aid of an investigation that potentially might result in a recommendation of criminal prosecution. The court held that so long as the summons was issued in good faith pursuant to a Congressionally authorized purpose and prior to a referral to the Department of Justice, it was enforceable. The court's primary concern in the second prong of this two-pronged test was that a different holding would force the agency to choose before it had conducted its investigation between use of the summons and the possibility of an ultimate recommendation for prosecution. Thus, although the court did not explicitly so state, its reasoning makes clear that its focus was on a criminal reference by the same agency that was conducting the investigation, and not on a reference by a different agency.

The reasoning of *LaSalle* provides further support for the view that despite the DOE's criminal reference, the SEC's subpoena is enforceable. That case presented the question of whether an IRS summons, issued "solely for the purpose of unearthing evidence of criminal conduct," was in bad faith and thus unenforceable. The court upheld the summons. It emphasized that under the Congressional scheme agency investigations of civil and criminal matters were intertwined and summonses were to be used in investigations of potential civil as well as criminal violations; furthermore, at the time the summons in question was issued, the agency had not yet severed its criminal investigation from its civil investigation by referring the matter to the Department of Justice. Had such a reference occurred, however, the court stated that the subpoena would have been unenforceable. At the

core of this dictum lies the court's expressed apprehension that a contrary rule would lead to a broadening of the Justice Department's powers of discovery and possible infringement on the role of the grand jury. While acknowledging the importance of encouraging maximum cooperation between the government agencies in order to facilitate efficient settlement, the court recognized that in the course of such cooperation the Internal Revenue Service would necessarily share with the U.S. Attorney the information gleaned from its own investigation. By prohibiting post-reference use of the agency subpoena, the court recognized that it was promoting agency cooperation without expanding Justice's criminal discovery or infringing upon the role of grand jury.

■ These considerations generally do not apply to a situation in which an agency is conducting an investigation into a possible violation of one statute and a second agency makes a criminal reference based on same or similar facts that allegedly violate an entirely different statute. Only if the nonreferring agency actively assists the Department of Justice in its investigation do the dangers of broadening Justice's discovery and infringing on the province of the grand jury arise. The cooperation that is both unavoidable and encouraged between Justice and the referring agency, however, is neither inevitable nor even expected between Justice and a nonreferring agency. The court is therefore unwilling to hold as a matter of law that a nonreferring agency's investigation, commenced independently of a criminal investigation referred by a different agency, must cease simply because of the pendency of the independent criminal investigation.

The better analysis is one in which the court looks to the circumstances of the particular case to assess the nonreferring agency's role in the criminal investigation. The court must determine whether the sole purpose of the nonreferring agency's investigation and subpoena is to gather evidence for the criminal investigation or whether the subpoena was issued in good faith pursuit

of a Congressionally authorized purpose. *See United States v. LaSalle National Bank, supra,* 437 U.S. at 307, 98 S.Ct. 2357; *United States v. Donaldson, supra,* 400 U.S. at 533, 536, 91 S.Ct. 534. As discussed above, under *LaSalle* the good faith inquiry is whether the agency as an institution, and not merely a few individual employees, intends the only purpose of the investigation to be the development of information for use in the criminal prosecution.

The Sixth Circuit's decision in *United States v. Henry,* 491 F.2d 702 (6th Cir. 1974) supports this court's analysis. In that case, one Jackson was indicted for federal narcotics violations. Shortly thereafter, the Internal Revenue Service issued a sweeping summons to Henry, Jackson's attorney in the criminal matter. The summons sought information that had little bearing on the civil tax investigation of Jackson but was directly relevant to the ongoing criminal investigation. The court, emphasizing the nature of the information sought, the identity of the person summoned, and the close working relationship between the IRS and the Justice Department in pursuit of narcotics violators, found that the purpose of the IRS investigation was solely to assist the criminal prosecution. Relying on the dual *Donaldson-LaSalle* standard of good faith issuance pursuant to a Congressionally approved purpose and issuance before criminal reference, the circuit refused to enforce the subpoena. Significantly, the fact of the criminal prosecution alone was not determinative. Rather, the court, scrutinizing the circumstances of the particular case, concluded that the summons was not issued in good faith pursuant to a Congressionally approved purpose but rather was issued with the specific aim of furthering the ongoing criminal investigation. The summons, if enforced, thus would have had the effect of undermining the very policies that *LaSalle* sought to protect—policies of avoiding both the broadening of Justice Department discovery powers and infringement on the role of the grand jury. *See SEC v. Dresser Industries, Inc.,* 453 F.Supp. 573 (D.D.C.1978).

█ This case, however, is not *Henry.* An examination of the facts in this case does not reveal a lack of institutional good faith. Long before the DOE made its criminal reference, the SEC commenced its own separate investigation of OKC. The stated purpose of that investigation, as discussed above, is legitimate: the determination of whether certain persons have violated the antifraud and reporting provisions of the securities laws. Furthermore, the subpoena is relevant to that purpose. OKC, seeking to demonstrate institutional bad faith, has suggested that since the time of the criminal reference the SEC has been supplying the Department of Justice with information on OKC. OKC has had the opportunity to depose SEC personnel on this matter. It has questioned extensively Michael J. Stewart, Administrator of the Fort Worth Regional Office of the SEC, Cecil S. Mathis, Assistant Administrator for Enforcement in the Fort Worth Regional Office of the SEC, and Steven K. McGinnis, attorney for the SEC in its Fort Worth Regional Office. These depositions demonstrate that the SEC has in no way cooperated with or assisted the U.S. Attorney's Office or the Department of Justice in the pending grand jury proceeding and has disclosed to the Department of Justice no more than the nature of the SEC's investigation of OKC. There is no indication that any member of the SEC staff has violated Stewart's instructions not to communicate to the U.S. Attorney's Office or to the Department of Justice any facts, documents, information, or speculation concerning the SEC's investigation of OKC. Thus the evidence reveals that the SEC, in issuing this subpoena and conducting its investigation, is acting in good faith.

### III. Privilege

OKC contends that the Locke, Purnell report is privileged and that the SEC, by using the report as a basis for developing independent, unprivileged evidence, will effectively undermine that privilege. This court has not yet determined whether the Locke, Purnell report is privileged. Because the argument that OKC advances is invalid, however, whether the report was privileged need not now be resolved.

OKC's argument is flawed. The remedy that it requests will not further the purpose of the privilege. The privilege's goal is protection—to shield against compelled disclosure. OKC, however, does not seek to avoid the disclosure of privileged information. Rather, it seeks to prevent the SEC from using the privileged information to frame demands for information that are not privileged but that may corroborate or explain information contained in an allegedly privileged but already disclosed report.

█ Implicit in OKC's argument is the contention that, like the rule suppressing evidence seized in violation of the fourth amendment, a prophylactic exclusionary rule is a necessary buttress to the attorney-client privilege; that this subpoena should be quashed as a fruit of the poisonous tree. The aim of the fourth amendment's exclusionary rule, however, is protection of privacy by denying to government agents who would invade protected privacy the fruit of their conduct. In a case in which a government agency innocently learns of privileged information from a person who rightfully possesses that information, there is no conduct to deter unless it is the delivery of that information by a person who, although rightfully in possession of it, was not authorized to disclose it. Even then, the only deterrent value would be to reduce the incentive for such disclosure by barring the government's use of the information disclosed. In *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), use in a federal prosecution of evidence illegally seized by state officers was denied. The court was attempting to avoid an inducement to subterfuge ". . . with respect to federal-state cooperation in criminal investigation." *Id.,* 222, 80 S.Ct. at 1446. The disincentive to government agencies daily involved in law enforcement activity as compared to a private citizen who only occasionally enters the law enforcement arena is quite different. Apart from the fact that it is private, not government conduct that is sought to

be deterred, the marginal effectiveness of denying use to an innocent agency for reports produced not by a state but by a private citizen is not justified. Such a holding would place corporate attorney-client privilege on a higher plane than fourth amendment protected privacy. Plainly stating this result reveals that the reasoning path that leads to it is gossamer. The ultimate truth is that the attorney-client privilege does not enjoy that level in the hierarchy of values contended for by OKC.

### IV. The Fourth Amendment and Appellate Review

OKC again urges, as it did in *OKC v. Williams, supra,* that the SEC in obtaining and using the Locke, Purnell report has violated OKC's Fourth Amendment rights. The court in *Williams* granted the SEC's motion for summary judgment on this issue. Here, however, OKC takes a different tack. Contending as it did in *Williams* that the DOE improperly solicited the theft of the report and that a copy of that report found its way to the SEC, OKC argues for the first time before this court that because there is no "silver platter" doctrine between federal agencies, the SEC's use of that report is tainted.

The leading Supreme Court case rejecting the so-called silver platter doctrine is *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437 (1960). As earlier noted, the court held that if a state law enforcement officer seizes evidence in violation of the Fourth Amendment, that evidence cannot be admitted in a federal prosecution. The court's goal in so extending the exclusionary rule was to deter constitutional violations; in applying the rule to situations such as the one before it, the court sought to eliminate the "inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigations." 364 U.S. at 222, 80 S.Ct. at 1446.

The principles of *Elkins* simply are inapplicable to the particular facts of this case. Adams gave Wade the report for the limited purpose of performing a tax analysis. Adams test., p. 44. According to OKC,

DOE's Clements improperly solicited several employees, including Wade, to supply him with a copy of the report. Wade gave a copy of the report to Patrick and Ownby who in turn gave it to Clements. The testimony does not indicate, however, that Clements either intended that the SEC should also have a copy or knew that the employees would give the SEC the report. Clements test., 128–138; Wade test., 125, 127; Ownby test., 165. Rather, Wade, Patrick, and Ownby decided *on their own* to give a copy to the SEC. The two crucial facts thus are that Wade legitimately possessed the report, albeit for a limited purpose, and that he and other employees decided without governmental solicitation to give the report to the SEC. That Clements in the interim may have convinced them to supply his agency with a copy of the report is irrelevant. There is no nexus whatsoever between the DOE's inducement and the SEC's eventual possession of the report. This is not a situation in which the DOE induced the employees to steal the report; by OKC's own admission, Wade properly possessed it. Nor is this a case in which the DOE suggested or knew that the SEC should receive a copy of the report. Under the very narrow set of circumstances that this case presents, application of the exclusionary rule could have no deterrent purpose. A contrary holding would mean that an unconstitutional search or seizure by one arm of the government would forever bar any other governmental body from using the evidence so obtained, even if a person lawfully in possession of that evidence freely chose to deliver it to that second body. This court is unwilling to so interpret *Elkins.*

OKC further contends that enforcement of this subpoena will effectively destroy its appeal of this court's order of February 22, 1979 granting partial summary judgment for the SEC in *OKC v. Williams, supra.* That order also denied OKC's motion to stay the SEC's use of the report pending appeal. Upon this court's issuance of that order, OKC immediately applied to the Fifth Circuit for an order enjoining the

SEC's investigation, which that court denied. OKC then applied to the Supreme Court for a Writ of Injunction prohibiting the SEC from using the report. Justice Rehnquist denied the application. It is apparently the view of neither the Fifth Circuit nor Supreme Court that enforcement of this subpoena will destroy appellate review of the fourth amendment question. This court is unwilling to find to the contrary.

## V. The Investigation

OKC attacks the SEC's investigation as accusatory and contends that it lacks the necessary due process safeguards. Specifically, OKC challenges the constitutionality of the SEC's regulations, challenges the SEC's power to publish a report concerning OKC's conduct, and contends that the SEC has imposed certain sanctions demonstrating the appropriateness of full due process. Because the subpoena was issued in furtherance of these allegedly unconstitutional procedures, OKC argues it should not be enforced.

The SEC's investigatory procedure is clearly constitutional. In *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1959), the Supreme Court upheld the investigatory procedures adopted by the Commission on Civil Rights. That Commission did not afford persons accused of discrimination the right to be apprised as to the specific charges against them or as to the identity of their accusers, or the right to confront and cross-examine witnesses appearing at Commission hearings. Upholding the procedures, the Supreme Court emphasized that the claimed rights would unduly burden investigations and pointed out that agencies such as the SEC conduct such investigations without those procedural safeguards. The court stated:

> [W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. *Id.* at 442, 80 S.Ct. at 1515.

Similarly, in *Georator Corp. v. EEOC,* 592 F.2d 765 (4th Cir. 1979), the Fourth Circuit held that the EEOC's investigatory procedures do not violate due process. The Circuit stated that due process is satisfied if there is an opportunity to be heard before any final order of the agency becomes effective. Because a final disposition is one having "some determinate consequences for the party to the proceeding," the court found that the agency's investigative findings did not constitute a final order. *Id.* at 769, n.3, *quoting ITT v. Electrical Workers,* 419 U.S. 428, 443, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975). The court stated that the EEOC's investigatory fact findings had no such consequences until the agency or the charging party filed suit, at which time the appellant would be afforded full due process. Similarly, the SEC's investigatory fact findings have no "determinate consequences;" if on the basis of the investigation, the agency elects either to commence an enforcement proceeding or to make a criminal reference, OKC will be afforded full due process rights at that time.

Second, OKC complains of the SEC's power to publish a report that might be detrimental to OKC. The court assumes that OKC is challenging the SEC's power under § 21(a) of the Securities Exchange Act of 1934 to publish information in the public interest concerning violation of the securities laws. Whatever OKC is referring to, it is clear that no such report has been issued. Thus OKC is asking this court to make a premature adjudication in a case in which no actual injury has occurred or been threatened. The Supreme Court in *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) stated:

> The power of the courts and ultimately of this Court . . . arises only when the interests of litigants require the use of this judicial authority for their protec-

tion against actual interference. A hypothetical threat is not enough. . . . [i]t would not accord with judicial responsibility to adjudge in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except where definite rights appear on one side and definite prejudicial interference upon the other. *Id.* at 89–90, 67 S.Ct. at 564.

The Supreme Court in *Hannah v. Larche, supra,* specifically rejected the validity of such conjectural allegations of harm when raised to support a challenge to an agency's investigatory procedures, 363 U.S. at 433, 80 S.Ct. 1502. Likewise, in *Jenkins v. McKeithan,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), the Supreme Court found that such purely hypothetical and collateral adverse consequences could not serve as a basis for finding an agency's investigatory practices unconstitutional. 395 U.S. at 424, 89 S.Ct. 1843. Therefore, the possibility that the SEC might issue a report pursuant to § 21(a) does not render its investigation accusatory.

 Finally, OKC contends that the SEC has in fact imposed sanctions sufficient to justify a holding that it is entitled to the full due process rights of an adjudicatory proceeding. Specifically, OKC claims that the SEC's Division of Corporation Finance has refused to declare effective the post-effective amendments to OKC's registration statement unless OKC agrees that it will not assert this approval in connection with the defense of any proceeding brought under the securities laws. Such "harm" is precisely the sort of collateral injury that the Supreme Court found could not justify the application of full due process standards to an agency investigation. *Hannah v. Larche, supra,* 363 U.S. at 443, 80 S.Ct. 1502; *see Jenkins v. McKeithan, supra,* 395 U.S. at 427, 89 S.Ct. 1843. That OKC will ever be affected by this so-called sanction is conjectural; the investigation is still going on, and the SEC has made no final decision as to any further proceedings in which OKC might have occasion to raise the approval as a defense. Furthermore, the "sanction" as OKC de-

scribed it has nothing to do with the investigation itself. It is not an effort to extract information or compel cooperation with investigators. It will have no effect on the investigation; OKC will feel its impact, if any, only in later proceedings in which OKC will be accorded full due process. Thus even if the SEC did state that it would approve the amendments only on the condition that OKC would not assert the approval as a defense, this incident has no relation to the investigation and does not justify granting to OKC the due process rights required in an adjudicatory proceeding.

The SEC's petition to enforce the subpoena duces tecum is GRANTED. OKC will comply with the subpoena within ten (10) days after entry of this order.