**OKC CORP.**

v.

**Harold M. WILLIAMS et al.**

**Civ. A. No. 3–78–1021–G.**

United States District Court,
N. D. Texas,
Dallas Division.

March 27, 1980.

Brice & Barron by George B. Davis, Dallas, Tex., special counsel, Ford, Marrin, Esposito, Witmeyer & Bergman by John J. Witmeyer, III, Richard B. Marrin, New York City, Arthur Mitchell, Gen. Counsel, Robert A. Miller, G. Scott Damuth, OKC Corp., Dallas, Tex., for plaintiff.

Michael J. Stewart, Regional Administrator, S.E.C., Cecil Mathis, David A. Watson, Steven K. McGinnis, Fort Worth, Tex., Walter E. Keller, Jr., Fort Worth, Tex., James H. Schropp, Asst. Gen. Counsel, Julie Allecta, S.E.C., Washington, D. C., for defendants.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This is an action by plaintiff OKC Corp. ("OKC") against the Securities and Exchange Commission and various commissioners, officers, and employees of the Commission (collectively "the SEC"). To simplify presentation of the issues, the court subdivided the litigation into two phases. In the first phase, the court granted partial dismissal and partial summary judgment in favor of the SEC. The court dismissed OKC's claims that the SEC had violated § 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e); that the SEC had violated the Privacy Act, 5 U.S.C. § 552a; and that OKC was entitled to monetary damages for SEC violations of the Freedom of Information Act, 5 U.S.C. § 552, and the fifth amendment.[1] The court granted summary judgment for the SEC on OKC's claim that its constitutional rights were violated by the SEC's receipt and use of a report prepared for OKC by a Dallas law firm.[2] In a related case, the court also ruled that OKC

---

1. *OKC Corp. v. Williams*, 461 F.Supp. 540 (N.D.Tex.1978). At the time of the court's dismissal of the fifth amendment damage claims, the Fifth Circuit had ruled *en banc* that no such damages were recoverable. *Davis v. Passman*, 571 F.2d 793 (5th Cir. 1978). Since that time, however, the Supreme Court has reversed the Fifth Circuit's decision, holding that an implied cause of action for damages does exist under the fifth amendment. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Hence the claim for damages under the fifth amendment will be considered herein notwithstanding the court's earlier order.

2. *OKC Corp. v. Williams*, [1979 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,773 (N.D.Tex.1979), *on reconsideration*, 490 F.Supp. 560, [1979 Trans-

was not entitled to suppression of the report due to alleged involvement of the Department of Energy in the report's acquisition, and rejected OKC's claim that the SEC's investigation of OKC was "accusatory" or "adjudicatory" in nature, thus requiring plenary due process protections.[3]

The SEC has now moved for summary judgment as to all remaining claims. The following issues remain undecided:

1. OKC's assertion that alleged disclosures made in connection with a meeting held on August 1, 1978, between members of the SEC staff and representatives of Ghaith Pharaon, concerning a proposed tender offer for the stock of OKC, violated § 24(b) of the Securities Exchange Act, 15 U.S.C. § 78x(b), and the fifth amendment.

2. OKC's assertion that intimidation of its employees by the SEC in connection with its investigation violated the fifth amendment.

3. OKC's Freedom of Information Act claim, to the extent that disclosure and not damages is sought.

### I. Necessity for Further Discovery

■ OKC argues that insufficient discovery concerning Phase II issues has taken place to allow a summary disposition. *See Littlejohn v. Shell Oil Co.*, 456 F.2d 225, 229 (5th Cir. 1972), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *OKC Corp. v. Williams, supra* n.1, at 545–46; *Ahmad v. Burke*, 436 F.Supp. 1307, 1313 (E.D.Pa.1977). The SEC responds that discovery already completed is more than adequate to develop the issues.

A vast quantity of discovery has already been undertaken in this case. The record includes dozens of depositions and hundreds of pages of affidavits. Most of this material was, however, developed during Phase I of this proceeding and while an informal stay of Phase II discovery was in effect. At the deposition of defendant Cecil Mathis, for example, SEC counsel refused to permit questions concerning Phase II to be asked at that time. Hence at the time of the instant motion in March of 1979, Phase II discovery had been limited.

A substantial period of time has elapsed since the filing of the present motion, due in large part to the court's attention to related matters. *See* n.3, *supra*. Since the court's orders in February, 1979, granting summary judgment for the SEC in Phase I, *see*, n.2, *supra*, over a year has elapsed. During this time, there has been no restriction on further Phase II discovery.[4] Any unexplored factual issues could and should have been dealt with during that time.

Notwithstanding the earlier suspension of Phase II discovery, much of the Phase I discovery touches on Phase II issues. In addition, depositions have been taken in Phase II of two of the three non-SEC participants in the challenged August 1 meeting. Depositions of any other participants in that meeting could have been taken if desired. Evidence concerning the allegation of SEC intimidation of OKC employees could have been received informally from those employees and transmitted to the court by affidavit. Fed.R.Civ.P. 56(c). Finally, the disposition of OKC's FOIA claim does not depend upon factual disputes but on issues of law, rendering additional discovery superfluous. It is therefore appropriate to proceed to a decision on the merits

fer Binder] Fed.Sec.L.Rep. ¶ 96,790 (N.D.Tex. 1979), *aff'd*, 614 F.2d 58 (5th Cir. 1980).

3. *SEC v. OKC Corp.*, 474 F.Supp. 1031 (N.D. Tex.1979), *appeal docketed*, No. 79–2427 (5th Cir. June 14, 1979). The court's findings and conclusions in that case are incorporated here by reference. *See also SEC v. Amarillo National Bank*, 474 F.Supp. 1042 (N.D.Tex.1979).

4. That OKC was aware that restrictions on Phase II discovery were no longer in effect is indicated by *its* notice of deposition, with elaborate *duces tecum* clause, of five SEC employees, three private individuals, and the SEC itself, filed only one week after the court's final February 22, 1979, order granting Phase I summary judgment. Apparently only two of these ten depositions were taken. A March 23, 1979, motion by the SEC for a protective order terminating all discovery, on the ground that no additional discovery was necessary, was never ruled upon by the court.

of the SEC's motion for summary judgment.

## II. The August 1, 1978, Meeting

### A. Constitutional Claims.

On June 5, 1978, Ghaith Pharaon announced a proposed tender offer for the common stock of OKC, and filed with the SEC the required notice of such tender offer on Schedule 14D–1. According to that filing, Pharaon was relying exclusively on the information publicly disclosed by OKC and contained in various filings made by OKC with the SEC. Shortly after the June 5 announcement, Frank Van Court, an attorney representing Pharaon, contacted defendant Theodore Levine of the SEC. This call, prompted by an underwriter's suggestion that an SEC investigation of OKC was under way, was for the purpose of inquiring as to the existence, scope, and nature of any such investigation. Levine told Van Court that he could not discuss the matter, but that Pharaon might be interested in contacting the Federal Energy Administration.

On July 26 or 27, 1978, Levine and another SEC employee contacted Van Court and John Watson (another Pharaon attorney) to arrange a meeting in Washington. In the course of one of these conversations, the possibility of an SEC injunction action against the Pharaon tender offer was mentioned.

Responsibility for reviewing the accuracy and completeness of the materials that form the basis for a public tender offer is vested in the SEC's Washington Division of Corporation Finance, Office of Tender Offers, Acquisitions and Small Issues. Following the filing by Pharaon of his tender offer proposal, SEC employees in that office reviewed the proposal and the public filings of OKC on which the Pharaon offer was expressly premised. In that process, they learned that a formal order of investigation naming OKC had been entered on March 27, 1978. Since that formal order had been entered after OKC's most recent public filing with the SEC, there was no information regarding the investigation in the publicly available materials. Moreover, a review of the formal order indicated that, if the suspected violations set forth in that order had occurred as indicated, the earlier public filings of OKC may have contained material omissions and misrepresentations.

Employees in the SEC's Division of Enforcement, in the reviewing branch of the Division of Corporation Finance, and in the Fort Worth Regional Office conferred, and a determination was made that the SEC ought not permit a public tender offer to proceed when it appeared that the offer was made in reliance on public disclosures that the staff had reason to believe were seriously deficient. Accordingly, Van Court and John Watson were contacted and asked if they would meet with the SEC staff to discuss the extent of their knowledge of certain matters undisclosed by OKC in its public filings that the staff believed were relevant to the proposed tender offer. The tender offer was delayed pending this discussion.

On August 1, 1978, Van Court, Watson, and another Pharaon representative met with several SEC staff members in Washington. The staff informed Pharaon's representatives that a formal order of investigation naming OKC had been entered and that the investigation was in an incipient stage. The staff then asked what type of due diligence inquiries had been made in connection with the proposed tender offer. In the context of asking whether Pharaon intended to favor one OKC faction over another, the staff inquired into Pharaon's motivation for proposing the offer. Specific questions were asked concerning whether, and to what extent, Pharaon had been advised of the various investigations involving OKC and the matters under investigation. The staff summarized the general areas that were being covered by the SEC investigation, although it did not provide details concerning the scope of its investigation.

At the meeting, Pharaon's representatives did not announce any decision regarding the tender offer. They were given repeated assurances, however, that the SEC would not seek to enjoin the offer if it were

to go forward. While there was some discussion of the possibility of halting trading in OKC's securities, John Watson testified that such an order would have had no direct impact on the tender offer. Pharaon's representatives were not shown any documents relating to the investigation, including the formal order. Nor was there any disclosure at the meeting by the staff that the basis for certain of their questions was sworn testimony relating to the tender offer and given in connection with the Commission's investigation.

■ OKC has failed to articulate the precise way in which the August 1 meeting deprived it of due process protections. It is apparent from the foregoing, however, that no due process violation occurred in connection with the August 1 meeting. The disclosures made at that meeting were limited to those necessary to provide the Pharaon representatives with a sufficient factual background to enable them to intelligently answer the SEC's questions. While OKC alleges that detailed confidential information was provided to the Pharaon representatives, including disclosures and discussion of the so-called Locke Purnell report, no competent nonhearsay evidence has been adduced to refute Van Court's testimony that he could recall no specific reference to the report, and that the Pharaon representatives were in any event not informed of the role which the report played in the SEC investigation. Nor is there any evidence of coercion or intimidation of the Pharaon representatives by the SEC, and Van Court denies that such occurred. The possibility of an injunction against the tender offer was mentioned in the July 26 or 27 telephone conversation, but the SEC stated repeatedly and explicitly on August 1 that no injunction would be sought.

■ Insofar as damages are sought for alleged due process violations, summary judgment for the SEC rests on an additional ground. In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court set forth a qualified immunity for executive branch officials acting in the scope of their official duties. Immunity is granted insofar as those officials act reasonably and in good faith. *See Fielder v. Bosshard*, 590 F.2d 105, 109 (5th Cir. 1979) (state officials under 42 U.S.C. § 1983). The record is devoid of any suggestion of bad faith (or unconstitutional acts) on the part of the SEC staff, and summary judgment is accordingly appropriate with respect to the damage claims. *See Butz v. Economou, supra*, 438 U.S. at 508, 98 S.Ct. at 2911.[5]

B. *Section 24(b) of the Exchange Act.*

OKC also alleges that the SEC violated § 24(b) of the Securities Exchange Act, 15 U.S.C. § 78x(b), at the August 1 meeting. That section provides that:

It shall be unlawful for any member, officer, or employee of the Commission to disclose to any person other than a member, officer, or employee of the Commission, or to use for personal benefit, any information contained in any application, statement, report, contract, correspondence, notice or other document filed with or otherwise obtained by the Commission (1) in contravention of the rules and regulations of the Commission under section 552 of Title 5, or (2) in circumstances where the Commission has determined pursuant to such rules to accord confidential treatment to such information.

At the outset, there is a serious question as to whether this section affords an implied private right of action. *See generally Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Ingram v. Ford Motor Co.*, No. CA–3–79–0493–G (N.D.Tex. Feb. 5, 1980) (order granting motion to strike). It

---

**5.** No opinion is expressed on the SEC's claim of absolute rather than qualified immunity. *See Burns v. Carter*, No. 77–421–MA (D.Mass. Apr. 30, 1979); *Tserpes v. S.E.C.*, 454 F.Supp. 940, 942 (S.D.N.Y.1978); *cf. OKC Corp. v. Williams, supra*, n.1, at 547. The court decides only that immunity is present even if qualified.

is not necessary to reach this issue, however, as the § 24(b) claim may be disposed of on other grounds.

■ There is no evidence before the court of any disclosure of information contained in any "application, statement, report, contract, correspondence, notice, or other document," nor is there any specification of what such a document might be (except for the Locke Purnell report, discussed above). Moreover, OKC points to no rule or regulation issued by the SEC pursuant to 5 U.S.C. § 552 (the Freedom of Information Act)[6] which OKC alleges to have been violated at the August 1 meeting.[7]

## III. Intimidation of Employees

Paragraph thirteen of OKC's complaint asserts that some of the defendants

> have intimidated, and continue to intimidate, witnesses subpoenaed to testify pursuant to the [SEC's order of investigation] by telling such witnesses that any claim of privilege by them will appear on their record. Such conduct . . . violates the rights of OKC, as well as the rights of such witnesses, under the Fifth Amendment to the Constitution of the United States of America.

**6.** The only possible such regulations are 17 C.F.R. §§ 200.80(b)(4), (5), and (7). Each of these sections contains a requirement, similar to that in 15 U.S.C. § 78x(b), that the disclosure be of material which is in written form. Even ignoring this "writing" requirement, the applicability of those sections remains doubtful.

While 17 C.F.R. §§ 203.2 and 203.5 designate formal investigations and the documents and information obtained thereby as "nonpublic," these regulations are not issued pursuant to the FOIA. Nor is there any indication that the regulations are intended to prohibit disclosure of the fact that an investigation is under way and the general areas of inquiry where such disclosure is necessary to obtain meaningful answers to SEC inquiries.

**7.** A further argument is made with respect to claims for damages (as contrasted with the injunctive relief also sought in the complaint). That argument proceeds as follows: The Court in *Butz v. Economou, supra*, was careful to limit its holding qualifying the immunity of federal executive officials to constitutional

■ The SEC correctly argues that OKC has no standing to assert the constitutional rights of its employees. In *Flavorland Industries, Inc. v. United States*, 591 F.2d 524 (9th Cir. 1979), a corporation was held in contempt for failure to comply with a grand jury subpoena requiring production of depositions of its employees. The Ninth Circuit rejected the defense of the employer that the subpoena violated its employees' fourth and fifth amendment rights, holding specifically that the employer had no standing to assert those rights. Hence OKC may not make a claim based on the argument that the alleged harassment violates its employees' rights.

OKC may, however, make the related argument that harassment of its employees by the SEC violates *its own* due process rights. Such an argument is not an attempt to vicariously assert the due process rights of others, but rather seeks redress for an injury to OKC itself. To recover under this theory, OKC must be prepared to show that harassment of its employees has produced a demonstrable injury to itself, either in terms of a diminished ability of the employees to properly perform their work, an inducement to the employees to act other than in the best interests of the company, or other like injury.

cases: "Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive a motion to dismiss." 438 U.S. at 507–08, 98 S.Ct. at 2911. *See id.* at 495 n.22, 98 S.Ct. at 2905. The law in this and other circuits is that, notwithstanding *Butz*, federal officials continue to enjoy absolute immunity from nonconstitutional claims. *Miller v. DeLaune*, 602 F.2d 198, 200 (9th Cir. 1979); *Birnbaum v. United States*, 588 F.2d 319, 332 (2d Cir. 1978) (dictum); *Granger v. Marek*, 583 F.2d 781, 784 (6th Cir. 1978); *Evans v. Wright*, 582 F.2d 20 (5th Cir. 1978); *Shermco Industries, Inc. v. Secretary of the Air Force*, No. CA–3–76–1186–G (N.D.Tex. Jan. 18, 1980) (order denying motion to dismiss); *Litvak Meat Co. v. Padilla*, 470 F.Supp. 1040 (D.Colo.1979); *Edwards v. Reynaud*, 463 F.Supp. 1235, 1239–40 (E.D.La.1979). The court notes this argument but does not rest its decision on this aspect of the *Economou* doctrine in light of doubts concerning its applicability to alleged violation of federal statutes.

■ With the issue so stated, the intimidation question may easily be resolved. The record reflects the total absence of any intimidation of OKC employees by the SEC. Indeed, the only testimony on the subject of intimidation suggests that OKC may have retaliated against some of its own employees for their cooperation with the SEC. OKC has likewise proffered no fact issue of injury to itself arising from any alleged intimidation. Summary judgment is thus appropriate to dispose of the intimidation claim.

### IV. The Freedom of Information Act Claim

#### A. Exhaustion of Administrative Remedies.

On June 21, 1978, OKC filed a Freedom of Information Act ("FOIA") request with the Fort Worth Regional Office of the SEC. That request sought access to 14 broad categories of documents which OKC believed were located at the Fort Worth Regional Office. The Assistant Regional Administrator rejected the request, stating it could be filed only in the Washington office of the SEC.[8] A copy of the request was, however, left with the Fort Worth office.

OKC then mailed a copy of its request to the offices of the SEC in Washington. The parties dispute whether the request was received by the SEC in Washington on June 26 or June 27.[9] On July 12, OKC was contacted by an SEC FOIA officer by telephone. According to the SEC, this conversation culminated in a voluntary agreement to extend the SEC's response time [10] to July 21, 1978. The SEC's understanding was confirmed in a letter to OKC dated July 14. According to OKC, however, no such agreement was ever reached or even discussed: the SEC instead unilaterally announced that it was invoking 5 U.S.C. § 552(a)(6)(B)

and 17 C.F.R. § 200.80(d)(7) to extend to July 21 the time in which it was to respond.

On July 20, 1978, the SEC denied OKC's FOIA request in its entirety. No administrative appeal of this decision was taken.

■ Given the genuine factual disputes, the SEC's claim of nonexhaustion cannot be resolved on a motion for summary judgment. If the July 12 telephone conversation did involve a voluntary agreement, OKC would likely be estopped from asserting a lack of timely response, on the ground that it had waived any delay. This would be true whether or not the response time had then expired. On the other hand, if the SEC was attempting to extend the response time unilaterally and as of right, it becomes critical to determine whether the response time had already expired. In determining this question, we must use July 14, the date of the SEC's written notice, rather than the July 12 date of the oral communication, since 5 U.S.C. § 552(a)(6)(B) and 17 C.F.R. § 200.80(d)(7) each explicitly require written notice of an intent to extend the response time.

Assuming *arguendo* that the request was received by the SEC on June 27 (the latest arguable date), the SEC's extension of time on July 14 would nevertheless be untimely. Neglecting the day of June 27 and the day of July 4 (a legal public holiday), the response time expired at the end of the day on July 12. The SEC's confirmation letter was concededly not dated until July 14. Thus the nonexhaustion claim must stand or fall on the presence or absence of a mutual rather than unilateral extension.

#### B. Exemption 7(A).

While the SEC has not yet proven that OKC failed to exhaust its administrative

---

**8.** It is unclear whether this decision was correct, since 17 C.F.R. § 200.80(d)(1) provides that requests for documents located at a regional office may be filed at the regional office. Under the resolution reached herein, it is not necessary to resolve this issue.

**9.** The return receipt is stamped "Rec'd S.E.C. Jun 26 1978 B.T. Harris." The cover letter

from OKC to the SEC, however, is stamped "received Jun 27 1978 Sec. & Exch. Comm. FOIA Office."

**10.** Ordinarily ten days from receipt, excluding Saturdays, Sundays, and legal public holidays. 5 U.S.C. § 552(a)(6)(A)(i).

584

remedies under the FOIA, it argues in the alternative that all the requested material is exempt from disclosure under FOIA exemption 7(A), 5 U.S.C. § 552(b)(7)(A), in that it constitutes "investigatory records compiled for law enforcement purposes" whose production would "interfere with enforcement proceedings."

The scope of exemption 7(A) was recently addressed by the Supreme Court in *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). In that case, Robbins Tire sought disclosure of witness statements obtained by the NLRB in preparation for a hearing on a complaint charging Robbins Tire with unfair labor practices. The NLRB invoked exception 7(A), but did not attempt to demonstrate on a document-by-document basis that disclosure would interfere with the enforcement proceeding. The Court held such individualized proof to be unnecessary, holding that a finding of "interference with enforcement proceedings" could be based on a generic evaluation of the type of proceeding involved and the type of records at issue. The Court noted the purpose of exemption 7, to prevent "harm [to] the Government's case in court," S.Rep.No.813, 89th Cong., 1st Sess. (1965), together with concerns expressed by Senator Humphrey on the floor of the Senate that the FOIA not be construed as authorizing advance disclosure of witness statements.

■ The SEC, citing *Associated Dry Goods Corp. v. NLRB*, 455 F.Supp. 802, 812 (S.D.N.Y.1978), argues that exemption 7(A), as interpreted in *Robbins Tire*, creates a blanket exemption for investigatory files during the pendency of an investigation and any law enforcement proceeding that re-

sults therefrom, upon a showing that the investigation and any related proceedings have not been concluded. In so arguing, the SEC misreads the scope of the *Robbins* and *Associated Dry Goods* opinions. While the Court in *Robbins* did state that "the statutory language clearly suggests that the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against," 437 U.S. at 232, 98 S.Ct. at 2322, that statement must be read in context with what followed in the Court's opinion. The Court granted FOIA exemption only after reviewing (albeit on a generic rather than an individualized basis) the nature of the requested material to determine whether its disclosure would prejudice ongoing enforcement proceedings. 437 U.S. at 236–42, 98 S.Ct. at 2324–27. *See Grabinski v. IRS*, 478 F.Supp. 486 (E.D.Mo.1979), and *Steinberg v. IRS*, 463 F.Supp. 1272 (S.D.Fla.1979), where exemption was granted only after a specific finding of interference. To have done otherwise would have read the "interference with enforcement proceedings" proviso out of exception 7. Otherwise stated, it cannot be said as a matter of law that disclosure of all types of material in investigatory files would necessarily interfere with all types of enforcement proceeding. Rather, the court, following the *Robbins Tire* procedure, must determine from the type of material sought and the type of enforcement proceeding commenced or contemplated whether such interference would be present.

■ In the present case, OKC's request seeks 14 broad categories of documents.[11]

11. The request is for the following documents:
(1) All reports, memoranda, notes and other materials and records, including but not limited to the staff report mentioned in the Order Directing Private Investigation and Designating Officers to Take Testimony, In the Matter of OKC Corporation (sic) FW–1701, issued March 27, 1978 (the "Order"), prepared by the Commission or its staff which in any way concern OKC or any of its officers, employees, directors or shareholders (or any affiliates of any thereof) and which in

any way relate to any investigation by the Commission or any other federal agency.
(2) All papers, books, documents, correspondence, transcripts and other materials and records in which appears the name of any person who has furnished or offered to furnish to the Commission or its staff any information which in any way relates to the investigation pursuant to the Order.
(3) All papers, books, documents, correspondence, transcripts and other materials and records in which appears the name of

any person who has been or is to be subpoenaed pursuant to the Order.

(4) All papers, books, documents, correspondence, transcripts and other materials and records relating to the time and location at which testimony or other evidence has been or is to be taken from any person pursuant to the Order.

(5) Copies of all subpoenas issued pursuant to the Order, and copies of all papers, books, documents and other materials and records produced pursuant to such subpoenas.

(6) All transcripts and recordings of any testimony taken pursuant to the Order.

(7) All papers, books, documents, correspondence, transcripts and other materials and records, including but not limited to statements of witnesses and other persons, notes and memoranda relating to conversations and/or interviews with witnesses and other persons, and transcripts and recordings of testimony conversations and/or interviews of witnesses and other persons, furnished to, or obtained or prepared by, the Commission or its staff in connection with the investigation pursuant to the Order.

(8) All papers, books, documents, correspondence, transcripts and other materials and records which the Commission or its staff has obtained from, or furnished to, any other federal agency or any state agency and which in any way relate to OKC or any of its officers, employees, directors or shareholders (or any affiliates of any thereof), including but not limited to all reports, notes and memoranda of conversations between the staff of the Commission and the staff of any other federal agency (including but not limited to the Department of Energy and Internal Revenue Service).

(9) All papers, books, documents, correspondence, transcripts and other materials and records concerning:

(a) transactions involving OKC, its officers, directors and employees, and petroleum product brokers;

(b) real estate transactions entered into by OKC or its subsidiaries;

(c) business dealings between OKC and relatives of OKC's officers, directors and employees;

(d) transactions not reflected on OKC's books and records;

(e) non-interest bearing bank deposits;

(f) personal use by OKC's officers, directors, and employees of corporate assets;

(g) payments to foreign officials;

(h) illegal political contributions; and

(i) financial condition of OKC at years end 1974, 1975, 1976 and 1977.

(10) All papers, books, documents, correspondence, transcripts and other materials and records which:

(a) describe the specific transactions and identify the specific officers, directors and employees of OKC and specific petroleum product brokers mentioned in section II A(1) of the Order;

(b) describe the specific real estate transactions and identify the specific subsidiaries of OKC mentioned in section II A(2) of the Order;

(c) describe the specific business dealings and identify the specific relatives of OKC's officers, directors and employees mentioned in section II A(3) of the Order;

(d) describe the specific transactions not reflected on OKC's books and records which are mentioned in section II A(4) of the Order;

(e) describe the specific non-interest bearing bank deposits mentioned in section II A(5) of the Order;

(f) describe the specific personal uses of corporate assets mentioned in section II A(6) of the Order and identify the specific officers, directors and employees of OKC making such uses and the specific corporate assets so used;

(g) describe the specific payments and identify the specific foreign officials mentioned in section II A(7) of the Order;

(h) describe the specific illegal political contributions mentioned in section II A(8) of the Order;

(i) describe the specific financial condition of OKC at years end 1974, 1975, 1976 and 1977 mentioned in section II A(9) of the Order;

(j) describe the specific offers and sales mentioned in section II B of the Order and identify the specific persons mentioned therein;

(k) identify the specific persons and entities and describe the specific purchases and sales, the specific devices, schemes, and artifices to defraud, the specific false and misleading statements and the specific omissions to state material facts which are mentioned in section II A of the Order;

(*l*) describe the specific acts and practices and identify the specific possible violations which are mentioned in section III of the Order;

(11) All papers, books, documents, correspondence, transcripts and other materials and records mentioned in, relating to, or forming the basis for, the staff report mentioned in the Order.

(12) All memoranda, notes, correspondence, instructions, lists and other materials and records showing or pertaining to any materials and records which are not furnished to OKC pursuant to this request and/or the alleged grounds for not furnishing to OKC such materials and records.

Most of these categories call on their face for investigatory records. Among the types of materials sought are staff reports, names and statements of witnesses, documents produced pursuant to subpoena, interview notes, inter-agency memoranda, indices and tables of contents, and supporting documents relating to the SEC's investigatory order. It is clear that these materials form an integral part of the SEC's total work product in its investigation of OKC. Premature disclosure of these types of materials might serve to reveal SEC strategy and provide confidential details of the SEC investigation, enabling a company under investigation to contact and harass adverse witnesses and otherwise impede the investigation and any later enforcement proceedings.

The SEC has broad enforcement powers under both securities acts. *See* 15 U.S.C. §§ 77t and 78u. Under those sections, the SEC may conduct investigations into suspected violations. 15 U.S.C. §§ 77t(a) and 78u(a). Should circumstances warrant, the SEC may bring injunction proceedings in the district court. 15 U.S.C. §§ 77t(b) and 78u(e). The SEC may also refer matters to the Attorney General for possible criminal prosecution. *Id.* Should these matters reach the stage of litigation, OKC will have access to the full panoply of civil and criminal discovery tools.[12]

Accordingly, the SEC's motion for summary judgment is GRANTED as it relates to items 1–8 and 10–14 of OKC's FOIA request.

(13) All files, indexes and tables of contents reflecting information furnished to, and/or obtained by, the Commission in connection with the investigation pursuant to the Order;

(14) All other records in any way relating to the investigation pursuant to the Order, including but not limited to any "investigatory records," as defined in 17 CFR § 200.-80(b)(7)(ii).

12. While the Fifth Circuit has expressed concern lest the FOIA be used as a device to enlarge the scope of discovery in litigation between the government and the requesting party, *see United States v. Murdock*, 548 F.2d 599,

## C. *Item 9.*

A different situation is posed by OKC's request no. 9. That request seeks nine categories of information about OKC, and is the only request not directly tied to the pending investigation. Some of these items [*e. g.*, 9(d), 9(f), and 9(h)] involve materials which are undoubtedly directly related to the SEC investigation. Others are more sweeping, and may involve materials routinely gathered as a part of the SEC's information clearinghouse function and not its investigatory function. For example, item 9(i) would include OKC's annual reports on Form 10K, disclosure of which would certainly not interfere with any investigation. For this reason, summary judgment must be denied as to item 9. In light of the large quantity of documents apparently included in item 9, it is not practical for the court to conduct an *in camera* inspection. Possible solutions include appointment of a master; reference to a United States Magistrate; a hearing to determine (by categories) which documents are subject to the exemption; or an order for the SEC to release nonexempted documents followed by continued litigation over the remaining documents, if necessary. In any event, disclosure depends on a finding of exhaustion of administrative remedies. Hence disposition of the merits of the FOIA claim must await a decision at trial on the exhaustion question. Prior to trial, the parties should submit proposals for the procedure to be used if exhaustion is found.

602 (5th Cir. 1977); *Steinberg v. IRS, supra*, at 1274, it has stated that "the needs of particular litigants are not relevant to the question of disclosure," *Hoover v. United States Department of the Interior*, 611 F.2d 1132, 1137 (5th Cir. 1980), in light of the fact that the FOIA and discovery rules "provide two independent schemes for obtaining information through the judicial process." *United States v. Murdock, supra*, at 602. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n.10, 95 S.Ct. 1504, 1513 n.10, 44 L.Ed.2d 29 (1975). The court mentions the availability of discovery only to indicate that means are available to fulfill any particularized needs of OKC not shared by the public generally.

### V. Conclusion

For the foregoing reasons, summary judgment for the SEC is GRANTED except as it relates to Item 9 of OKC's Freedom of Information Act request. As the court stated in its February 22, 1979, order:

> Summary judgment ought to be used sparingly in claims laced with constitutional overtones. But the standard ought not to be one of "slightest doubt." *See Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972). The plain language of the rule is genuine issue and to require a movant to show more than the absence of a "genuine" issue is to impose judicial gloss upon the rule. . . . The "issue," despite a mighty effort by resourceful counsel, leaves me firmly convinced that only concocted, not genuine, issues of fact remain. If Rule 56 is to have any meaningful role in complex cases, the courts must be sensitive to sifting the real from the fanciful.

490 F.Supp. at 560, [1979 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,790, at 95,108. The court's comments concerning the Phase I summary judgment are equally applicable here.